[No. E050247. Fourth Dist., Div. Two. Apr. 5, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
FELIX ANTONIO AREVALO-IRAHETA, Defendant and Appellant.

**Counsel**

Patrick J. Hennessey, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Lilia E. Garcia and Meagan J. Beale, Deputy Attorneys General, for Plaintiff and Respondent.

**Opinion**

**MILLER, J.**—A jury convicted defendant Felix Antonio Arevalo-Iraheta of five counts of lewd and lascivious behavior with a child under the age of 14 (counts 6 through 10—Pen. Code, § 288, subd. (a)).[1] The jury deadlocked on five counts of aggravated sexual assault on a child under the age of 14 (counts 1 through 5—§ 269, subd. (a)(1)). The court dismissed counts 1 through 5 upon the People's motion. The court sentenced defendant to an aggregate determinate prison term of 16 years. On appeal, defendant contends the court erred in permitting the People to amend the information

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

midtrial to add five additional counts (the counts for which defendant was convicted), committed judicial misconduct in ruling on defendant's section 1118.1 motion in the presence of the jury, and in failing to give a unanimity instruction as requested. We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

The victim's mother moved from El Salvador to Riverside in May 2005. While residing in the United States, the victim's mother had two children with defendant. This angered the victim. She wanted her mother to return to El Salvador; she testified that her mother stayed in the United States solely because of her relationship with defendant. The victim wanted her mother to reconcile with her father. Nevertheless, in February 2008, the then 13-year-old victim moved from El Salvador to Riverside to join her mother.

The victim stayed in a converted garage bedroom with her mother, defendant, and her two younger brothers. The victim wanted defendant to move out of the house; she wanted defendant and her mother to break up. The victim believed that her mother could have done better than defendant; she testified she never liked him and still does not.

The victim's mother left for work with the victim's aunt every day, Monday through Friday, between 2:00 and 2:30 p.m. They would not arrive home until between 11:00 p.m. and 1:00 a.m. Defendant worked seven days a week from 10:00 p.m. to 6:30 a.m. He testified he would normally sleep from between 11:00 a.m. and 2:00 p.m., and 4:00 p.m. and 8:00 p.m. every day. He testified he would pick the victim up from school between 3:00 and 3:30 p.m.

The victim testified that sometime in April 2008, defendant came into the bedroom between 5:30 and 6:00 p.m. He locked the door, told her that he liked her, grabbed her hands, pinned her to the bed, took off her pants, and touched her over her entire body. He told her he wanted to "abuse" her. She screamed for help, to no avail. She could not move because his body was on top of her; she unsuccessfully tried to punch him. He held her down by her shoulders; he tried to kiss her, but she would not let him. Defendant then engaged in sexual intercourse with her, lasting "three or four minutes." He told her that if she told anyone she "would have to suffer the consequences"; he would kill one of her family members. The entire episode lasted around 10 minutes. She left the room, crying, to take a bath.

The victim testified that over the ensuing months, defendant engaged in similar acts of sexual intercourse with her, "approximately 75 times." It always occurred in the same room, always while her mother was at work, and always in the same manner. It typically occurred between 5:00 and 5:30 p.m.

Defendant always locked the door. On more than 30 occasions she was watching television in another room; defendant would grab her and carry her into the bedroom. Whenever she would cry for help, he would cover her mouth. She frequently cried for help. He always tried to kiss her on the mouth, but she never let him; she never kissed him back. She resisted telling her mother because she was afraid her mother would blame her for the encounters.

The victim testified that in August 2008, she attempted to commit suicide because she wanted the molestation to stop. She took an entire jar of Advil and another bottle of expired pills. She became dizzy, fell asleep, and awoke the next day vomiting. She then told her aunt what had been occurring. Her aunt informed her mother and called the police.

On August 10, 2008, Officer George Sepulveda responded to the victim's home with respect to a reported child sexual assault. After getting background information from the victim, he took defendant to the police station.[2] Officer Sepulveda read defendant his *Miranda*[3] rights, which defendant waived. He then interviewed defendant.

Defendant initially denied engaging in sexual contact with the victim; however, he later admitted to having sex with her "about six times." Defendant informed the officer the incidents began in the past month, July 2008. They each occurred around 4:00 p.m. in his bed. The last time he engaged in intercourse with the victim was around five days earlier.

Defendant maintained that the victim initiated all the encounters. While he was sleeping she would get in his bed, hug him and "abuse" him. She would take off her clothes. He initially resisted her advances, but later lost control. She threatened to tell her mother and/or the police that defendant was having sex with her, unless he had sex with her. He relented out of fear. "She was always, always after" him. "She wanted me to be hers." He was with her "[b]ecause she liked it." Later, when he told her he was going to move out, she said she could not live without him; she threatened to kill herself if he left. He stayed because he did not want her to kill herself.

At trial defendant testified that the victim flirted with him, dressed provocatively, asked her how a man should treat a woman, and asked him if he

---

[2] Officer Sepulveda's interview with defendant was conducted in Spanish. The interview was recorded, and the recording was played to the jury at trial. A translated transcript was entered into evidence at trial. Officer Sepulveda testified that he went through the entire recording and reviewed the English transcription, and it was "a fair and accurate translation of the Spanish conversation" he had with defendant.

[3] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

liked her. The first physical encounter between them occurred in May 2008, around 6:00 p.m. He was sleeping and awoke to the victim hugging and caressing him. He told her to leave the room. He did not inform the victim's mother of the victim's behavior because the victim threatened to go to the police.

Defendant testified the first time he and the victim had intercourse was approximately eight to 10 days after the first physical incident. She asked him if he knew how to please a woman; he responded that he did not. She said that she was "a professor of kissing," "a master kisser." The victim told defendant she would teach him. He told her he could not be with her, but she "insisted." She got on top of him; she said " 'I want you to please me. I want to feel like a woman.' " She took off her clothes and his shirt; he pulled his pants down. He became aroused.

Defendant engaged in sexual intercourse with the victim because he "had to do it." He knew "it was wrong, but [he] had no other choice because otherwise" her family would exact revenge or the victim would call the police. They engaged in intercourse for 10 to 15 minutes; he was on top. She never screamed for help.

Defendant testified he eventually engaged in sexual intercourse with the victim "about 20 to 25 times" between May and August 2008. He knew that she was 13 years old. At the beginning he only had sex with her out of fear, but he was physically attracted to her and later fell in love with her.

## DISCUSSION

### A. *Amendment of the Information*

Defendant contends the court erred in permitting the prosecution to amend the information to add an additional five counts midtrial. He maintains he was prejudiced by the amendment in that he was ambushed with defending against charges he had never been put on notice of in the preliminary hearing. Defendant asserts that his intended defense that all the sexual encounters occurring between him and the victim were consensual would, if believed by the jury (as it apparently was), have proven a complete bar against conviction for the aggravated sexual assault charges. Thus, he claims the court's action denied him of his due process right to prepare a defense because he now faced charges for which his defense became a confession. We disagree with defendant that he was impermissibly prejudiced by the amendment.

 A court may allow amendment of an accusatory pleading at any time up to and including the close of trial so long as there is no prejudice to the

defendant. (*People v. Graff* (2009) 170 Cal.App.4th 345, 361 [87 Cal.Rptr.3d 827].) An indictment or accusation, however, "cannot be amended so as to change the offense charged, nor an information so as to charge an offense not shown by the evidence taken at the preliminary examination." (§ 1009.) "Section 1009 specifically proscribes amending an information to charge an offense not shown by the evidence taken at the preliminary hearing." (*People v. Winters* (1990) 221 Cal.App.3d 997, 1007 [270 Cal.Rptr. 740] (*Winters*).)

"[T]he role of the accusatory pleading is to provide notice to the defendant of the charges that he or she can anticipate being proved at trial. 'When an accusatory pleading alleges a particular offense, it thereby demonstrates the prosecution's intent to prove all the elements of any lesser necessarily included offense. Hence, the stated charge notifies the defendant, for due process purposes, that he must also be prepared to defend against any lesser offense necessarily included therein, even if the lesser offense is not expressly set forth in the indictment or information.' [Citation.]" (*People v. Anderson* (2006) 141 Cal.App.4th 430, 445 [45 Cal.Rptr.3d 910].) " '[A]t a minimum, a defendant must be prepared to defend against all offenses of the kind alleged in the information as are shown by evidence at the preliminary hearing to have occurred within the timeframe pleaded in the information.' [Citations.]" (*People v. Jones* (1990) 51 Cal.3d 294, 317 [270 Cal.Rptr. 611, 792 P.2d 643].) The trial court's accession to an amendment to the information, including the addition of counts, is reviewed for abuse of discretion. (*People v. Bolden* (1996) 44 Cal.App.4th 707, 716 [52 Cal.Rptr.2d 485]; *Winters, supra,* 221 Cal.App.3d at p. 1005.)

Here, the People initially charged defendant by complaint on August 13, 2008, with five counts of aggravated sexual assault *of a child under the age of 14*. At the preliminary hearing held on February 27, 2009, Officer Casey Reid testified that he responded to the victim's home on August 10, 2008. The victim (*born Dec. 1994*) told him that defendant began sexually assault-ing her in April 2008 (*when she was 13 years old*). Defendant continued to have sexual intercourse with her approximately five times a week, Monday through Friday, around 5:30 p.m., through August 7, 2008. The information filed on March 12, 2009, charged defendant with five counts of aggravated sexual assault *of a child under the age of 14*. As defendant himself equivo-cally admits, the section 288, subdivision (a) charges in counts 6 through 10 were lesser necessarily included offenses of the aggravated rape of a child charges in counts 1 through 5. (*People v. Peyton* (2009) 176 Cal.App.4th 642, 655, fn. 7 [98 Cal.Rptr.3d 243] [Fourth Dist., Div. Two] (*Peyton*); see CALCRIM No. 1123.)

The People sought to amend the information, prior to the close of their case, to add five additional counts of lewd and lascivious behavior with

a child (counts 6 through 10—§ 288, subd. (a)).[4] Defendant objected on due process grounds regarding the timing of the amendment. The court responded, "I would tend to agree with you, but for the fact the evidence has been presented of the defendant's voice [that] would indicate the defendant has admitted acts that would constitute [section] 288 [subdivision] (a) [offenses], because even if you took everything that he said in the tape as being absolutely true, that she was the seductress and came on to him, and that's the only reason they had sex, she was still a 13 year old. And under the law, the least touching with intent to gratify lust, passions, sexual desires of either the child or the adult is a violation of [section] 288 [subdivision] (a). [¶] So I think the lessers are appropriate and need to be filed."[5] The court later read the additional counts to the jury and informed it that "these latter charges being filed are what are called 'lesser charges' than the others. So you will still be required to decide the more important ones, and the first ones that were filed." Defendant later admitted on the stand that he knew the victim was 13 years old every time he engaged in sexual intercourse with her. Thus, there can be no valid assertion that defendant was not on notice that he was subject to defend against the lesser charges, for which he was eventually convicted, because the facts adduced at the preliminary hearing and allegations made in the accusatory pleadings more than adequately warned him of such.

Defendant contends that this court's decision in *Peyton* specifically bars the amendment of an information to include even lesser necessarily included offenses, when the People seek, as they did in this case, to add them *as additional charges*. (*Peyton, supra,* 176 Cal.App.4th at p. 655, fn. 7.) However, this language from *Peyton* is peculiar to the facts of that case. *Peyton* involved a situation in which the defendant *waived a preliminary hearing*; thus, the only notice the defendant had of the charges against him were the accusatory pleadings. (*Id.* at p. 649.) Therefore, we reversed the conviction on the charge added in the amended information "because it constituted an additional *charge not pled in the amended complaint to which defendant waived his right to a preliminary hearing.*" (*Ibid.,* italics added.)

---

[4] The People actually orally moved to amend the information to add *six* counts of lewd and lascivious behavior with a minor (counts 6 through 11). However, the amended information filed January 22, 2010, alleged only five counts. Thus, during closing and rebuttal argument, the People discussed only *five* counts of lewd and lascivious behavior. The defense responded, in kind, to only five counts in its closing. After the jury had been instructed by the court and retired for deliberations, the People requested, "[i]f there was anything entered into the minutes or records regarding Count 11, I ask to dismiss Count 11." The court apparently acquiesced; the court's dismissal of count 11 pursuant to section 1385 appears in the minute order, but not in the reporter's transcript. Nothing in the record explains the ephemeral existence of count 11.

[5] The reference to defendant's voice was to the recording of defendant's station house interrogation, during which he admitted engaging in sexual intercourse with the victim "about six times."

"[B]ecause defendant waived his right to a preliminary hearing, his section 288, subdivision (b) conviction in count 1 must be reversed." (*Id.* at p. 653.) "Simply put, section 1009 prohibits adding new charges to an accusatory pleading *after the defendant has waived his right to a preliminary hearing on that pleading.* In enacting section 1009, the Legislature determined that an accusatory pleading cannot be amended based on evidence not taken at the preliminary hearing. And when, as here, *no preliminary hearing* is held, the pleading cannot be amended to add *additional* charges." (*Id.* at p. 654, first & second italics added.)

Here, as discussed above, and unlike *Peyton*, defendant had a preliminary hearing in which evidence of the substance of the additional counts was adduced. Thus, unlike *Peyton*, defendant could not have been "surprised" by the contents of the additional counts. Indeed, had the People not moved to amend the information to add the additional counts, the court would have had a sua sponte duty to instruct the jury on those offenses as lesser necessarily included crimes. (*People v. Breverman* (1998) 19 Cal.4th 142, 154–155 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) Accordingly, he would still have been convicted of the same number and type of offenses. Defendant's exposition of *Winters, supra,* 221 Cal.App.3d 997, similarly fails to avail him. Like the defendant in *Peyton*, Winters waived his right to a preliminary hearing; thus, the amendment of the information in that case violated the rule that proscribes amendment of the information to charge an offense *not shown by the evidence taken at the preliminary hearing.* (*Winters*, at p. 1008.)

Defendant's explication of *Gray v. Raines* (9th Cir. 1981) 662 F.2d 569, 571 (*Gray*) likewise fails. In *Gray*, the defendant was charged by information with forcible rape. (*Id.* at p. 572.) The defendant was notified "near the close of the evidence" that the state was seeking a conviction of second degree rape (statutory rape). The defendant was convicted of the second degree rape charge. (*Id.* at p. 570.) The Arizona Supreme Court held that "because the alleged victim testified at a preliminary hearing before trial that she was seventeen years old, 'Gray was therefore on notice at that time that another part of the rape statute was applicable.' [Citation.]" (*Id.* at p. 571.) The circuit court held that the failure to charge second degree rape in the information rendered the defendant's conviction on that charge a per se violation of the federal Sixth Amendment's requirement that defendants be apprised of the charges they must defend against. (*Gray*, at p. 572.)

First, we note that we are not bound by the opinions of the lower federal courts. (*People v. Cleveland* (2001) 25 Cal.4th 466, 480 [106 Cal.Rptr.2d 313, 21 P.3d 1225].) Second, we observe that *Gray* involved an interpretation of Arizona's statutory and procedural law, not California's, in conjunction with federal constitutional provisions. Third, we find *Gray*

distinguishable. It is not at all clear that *Gray* even involved a question of amending the information. Indeed, the state in *Gray* merely informed the defendant "at an in-chambers jury instruction conference near the close of the evidence" that the state would be seeking a conviction of second degree rape under a statute not enumerated in the information. (*Gray, supra,* 662 F.2d at p. 570.) This contrasts sharply with the facts of the instant case, in which the People formally moved for and actually did amend the information to allege additional, enumerated charges prior to the close of their own case. Likewise, the charged offense in *Gray* did not require that the victim be a minor. On the contrary, the charge alleged first degree, i.e., forcible, rape, a charge that does not appear to distinguish between the age of the victim. (*Ibid.*) Thus, the defendant in *Gray* was not apprised of the fact that he could face a conviction for consensual sex with a minor. In this case, the initially charged offenses were not simply rape, but aggravated sexual assault against *a minor under the age of 14*; defendant was cognizant of the fact that he could face conviction of a lesser offense based on the victim's age.

Moreover, unlike the circumstances in the present case, Arizona law provided that second degree rape was not a lesser included offense of first degree rape. (*Gray, supra,* 662 F.2d at p. 571.) The court noted, " 'A person cannot be convicted of an offense (*other than a necessarily included offense*) not charged against him by indictment or information, whether or not there was evidence at his trial to show that he had committed that offense . . . .' " (*Id.* at p. 572, italics added, quoting *In re Hess* (1955) 45 Cal.2d 171, 174–175 [288 P.2d 5].) Here, defendant was convicted of necessarily included offenses that were charged against him in an amended information. Furthermore, the *Gray* court noted, "[t]he state was permitted to wait until [the defendant] had put on evidence of consent as a defense to the charged offense, and then use that evidence to convict [the defendant] of the second offense. Such a procedure is repugnant to the concept of due process and fundamental fairness." (*Gray,* at p. 573, fn. omitted.) The state in *Gray* did not even attempt to seek conviction for second degree rape until after the defendant had completed presentation of his defense. Here, the People amended the information prior to the presentation of defendant's defense. Indeed, the amendment occurred prior to the completion of the People's case. Therefore, the court acted well within its discretion in permitting the amendment of the information with the additional counts.

The only apparent error we can discern in the court's handling of the matter was its failure to clearly indicate that the five additional charges were based on *the same conduct alleged in the first five counts*. This caused confusion as the court was ambiguous as to whether the jurors would be permitted to find defendant guilty of all 10 (or 11) counts, or merely of five counts. For instance, the court informed the prosecutor, "there will simply be a definition of [section] 288 [subdivision] (a) in those five counts, and so all

11 counts will go to the jury for determination, but not as lessers, but simply for them to make a determination. And as I tried to emphasize to them, we were talking about it, that each count has to be decided separately, so they can find the defendant not guilty of all of the first five and guilty of the others or guilty of part and not guilty of others. It's up to them. And I'll emphasize to them again that each count has to be decided separately, independent of all the others." Here, the fact that the court had apparently granted the People's motion to amend the complaint to add six counts further complicated the matter, because it would be inherently impossible for the latter *six* counts to be based on the same conduct as the first *five* counts. Likewise, the court failed to instruct the jury with CALCRIM No. 3519 as required whenever greater and lesser included crimes are separately charged. (*People v. Fields* (1996) 13 Cal.4th 289, 309–310 [52 Cal.Rptr.2d 282, 914 P.2d 832] [duty of court to tell jury it may not return guilty verdict on lesser offenses unless it has found the defendant not guilty on the greater offenses]; CALCRIM No. 3519.)

The prosecutor, in his closing argument, argued that the "the only reasonable verdict you can come to is guilty on *all counts 1 through 10.*" (Italics added.) Yet he also argued that counts 6 through 10 were lesser charges to counts 1 through 5. Further, he averred that the jury had "to simply agree those same five incidences that you all agree occurred, Counts 1 through 5, use those same five incidences to use on Counts 6 through 10." Yet, in his rebuttal, the prosecutor again argued that the jury should "return guilty verdicts on Counts 1 through 10."

The failure of the court to properly instruct the jury caused obvious confusion. The jury queried the court whether "the first 5 counts represent[ed] 100% or a piece of the total occurrences? Should we consider acts outside of the 10 counts?" The court responded "[t]he 5 counts are all that [are] before you, even if there were more . . . acts." The jury then questioned whether "[l]egally, can [the victim] at age 13 give consent to have sex with [defendant]?" The court responded "Yes, she could give consent to counts 1 through 5 only." "She could never give consent to counts 6 [through] 10." Thus, the jury failed to acquit defendant of the greater offenses before finding him guilty of the lessers: the jury indicated that it had come to a nine-to-three impasse on counts 1 through 5, but found defendant guilty on counts 6 through 10. The court declared a mistrial on its own motion as to counts 1 through 5. The jury foreman then indicated the jury had hung on counts 1 through 5, nine in favor of a guilty verdict and three voting not guilty. The prosecutor and the court then engaged in a lengthy discussion of whether the People would seek to retry counts 1 through 5, a procedure barred pursuant to the provisions of section 1023. (*People v. Fields, supra*, 13 Cal.4th at pp. 305–306, 310.)

■ "[T]he trial court commits error if it receives and records a verdict of guilty on the lesser included offense without ever having given the jury an acquittal-first instruction." (*People v. Fields, supra*, 13 Cal.4th at p. 310.) "[W]hen the jury returns a verdict on the lesser included offense, it must also render a corresponding verdict of acquittal on the greater offense. If a verdict of guilty on the lesser offense is recorded and the jury discharged without having rendered any verdict on the greater offense, a retrial on the greater offense is barred under section 1023, regardless of whether the jury expressly deadlocked on that charge." (*Ibid.*) Fortunately, the trial court granted the People's motion to dismiss counts 1 through 5 after the court sentenced defendant on counts 6 through 10.

### B. *Judicial Misconduct*

Defendant essentially contends the trial court committed judicial misconduct when it ruled on and refused defense counsel's request to argue his section 1118.1 motion outside the presence of the jury. Although we agree the court should have argued the motion and issued its ruling outside the presence of the jury, we cannot find that defendant suffered any prejudice.

After the close of the People's case, defense counsel and the court engaged in the following colloquy:

"[Defense Counsel]: If I could have a quick motion with the Court, 1118.1.

"The Court: You don't have to specify you're making [a section] 1118.1 motion, which is a motion under the Penal Code to dismiss for insufficiency of the evidence.

"[Defense Counsel]: I argue this not be done in front of the jury.

"The Court: I'm saying this is what a motion consists [of], and based on the evidence I've heard I'm going to deny it. So you're wasting your time arguing it. If you want to put an argument on the record.

"[Defense Counsel]: Not in this forum, but thank you."

After the defense rested, defense counsel again engaged the court in a dialogue regarding its previous section 1118.1 motion:

"[Defense Counsel]: One last thing, your Honor, when I move[d] to dismiss based on 1118.1, the Court went ahead and stated its ruling in open court in front of the jury, and I thought basically what that implied to the jury was that the Court thought there was sufficient evidence that [defendant] is guilty of these offenses.

"The Court: Not so.

"[Defense Counsel]: And I think it persuades the jury as to the outcome of this case.

"The Court: If there is a need for clarification, if you feel I should explain this to the jury[,] I felt your motion was a routine motion that's frequently made by the defense and there was no need for argument because it was clear to me that there was enough to go to the jury. If you want me to clarify to the jury that I was certainly not expressing any opinion as to guilt, I was simply saying as far as what the prosecution, there was enough for the jury to make the determination, not for me.

"[Defense Counsel]: I probably was not going to argue it, but when it was done in open court, I knew at that time I could not argue it without the jury and possibly—well, without the jury knowing what my argument is before the trial was over."

The court offered to explain to the jury that in ruling on defendant's motion, it was simply asserting that there was sufficient evidence for the case to go to the jury for determination, i.e., he was not expressing his opinion on whether defendant was guilty or innocent of the charges against him. Defense counsel acceded to the court's offer. However, defense counsel later requested that the court make no further mention of the subject to the jury.

■ "As provided by section 1044, it is 'the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved.' However, 'a judge should be careful not to throw the weight of his judicial position into a case, either for or against the defendant.' [Citation.]" (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237 [39 Cal.Rptr.3d 799, 129 P.3d 10].) "A trial court may comment on the evidence [citation], but such comments 'must be accurate, temperate, nonargumentative, and scrupulously fair.' [Citation.]" (*Id.* at p. 1232.) " '[O]ur role . . . is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.' [Citation.]" (*People v. Snow* (2003) 30 Cal.4th 43, 78 [132 Cal.Rptr.2d 271, 65 P.3d 749].)

■ The parties have not cited nor has our own research revealed any published case establishing a rule that trial courts must rule on and permit argument on section 1118.1 motions outside the presence of the jury. Nevertheless, we note both from our own experience and from case law that

*argument* on section 1118.1 has historically been conducted outside the presence of the jury. (*People v. Powell* (2010) 181 Cal.App.4th 304, 310 [105 Cal.Rptr.3d 7]; *People v. Price* (1991) 1 Cal.4th 324, 408 [3 Cal.Rptr.2d 106, 821 P.2d 610]; *People v. Moran* (1973) 33 Cal.App.3d 724, 726 [109 Cal.Rptr. 287]; *People v. Cloud* (1969) 1 Cal.App.3d 591, 596–597 [81 Cal.Rptr. 716].) This is because, as defense counsel here asserted, argument may reveal to the jury the defendant's theory of the case before he has been able to introduce evidence that would support that argument. Likewise, unless the court is ruling on a perfunctory section 1118.1 motion, the court should issue any ruling on such a motion, particularly when it gives a statement of reasons for that ruling, outside the presence of the jury. Nonetheless, we discern no prejudice here.

First, defense counsel himself informed the court that he was probably not going to argue the motion regardless. This would be in accordance with the manner of many such motions in which counsel assert the motion by referring to the Penal Code section, but simply "submit" when asked for argument. Second, we cannot say that the court's minimal commentary informing the jury what a section 1118.1 motion was, and its summary denial of the motion, denied defendant a fair trial. As the court later explained, it was simply determining that sufficient evidence existed to permit the case to go to the jury for decision; it in no way conveyed the impression that it believed the People had proved beyond a reasonable doubt that defendant should be convicted of any or all of the charges. Third, defendant confessed on the stand to the behavior of which he was convicted. Thus, any error was harmless by any standard.

## C. *Unanimity Instruction*

Defendant contends the court erred in failing to instruct the jury with CALCRIM No. 3501 (the unanimity instruction) as he requested. He asserts that since evidence was adduced that defendant had committed as few as 20 to as many as 75 separate acts for which he could have been convicted in counts 6 through 10, the jury was required to unanimously agree on which acts it believed defendant had committed. Thus, the court's failure to give the requested instruction violated defendant's federal and state due process rights to a unanimous jury. We disagree.

█ A criminal defendant is entitled to a verdict in which all 12 jurors concur as a matter of due process under the state and federal Constitutions. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 [108 Cal.Rptr.2d 436, 25 P.3d 641].) In any case in which the evidence would permit jurors to find the defendant guilty of a crime based on two or more discrete acts, either the prosecutor must elect among the alternatives or the court must require the

jury to agree on the same criminal act. (*Id.* at pp. 1132–1133.) Where it is warranted, the court must give the instruction sua sponte. (*People v. Riel* (2000) 22 Cal.4th 1153, 1199 [96 Cal.Rptr.2d 1, 998 P.2d 969].) The omission of a unanimity instruction is reversible error if, without it, some jurors may have believed the defendant guilty based on one act, while others may have believed him guilty based on another. (*Russo*, at p. 1133.)

In *People v. Jones, supra*, 51 Cal.3d 294, the court rejected "the contention that jury unanimity is necessarily unattainable where testimony regarding repeated identical offenses is presented in child molestation cases. In such cases, although the jury may not be able to readily distinguish between the various acts, it is certainly capable of unanimously agreeing that they took place in the number and manner described." (*Id.* at p. 321.) Thus, the court concluded, "[t]he unanimity instruction assists in focusing the jury's attention on each such act related by the victim and charged by the People. We see no constitutional impediment to allowing a jury, *so instructed*, to find a defendant guilty of more than one indistinguishable act . . . ." (*Ibid.*, italics added.) "[W]hen there is no reasonable likelihood of juror disagreement as to particular acts, and the only question is whether or not the defendant in fact committed all of them, the jury should be given a modified unanimity instruction which, in addition to allowing a conviction if the jurors unanimously agree on specific acts, also allows a conviction if the jury unanimously agrees the defendant committed all the acts described by the victim." (*Id.* at p. 322.) Nevertheless, cases generally hold the omission of a unanimity instruction harmless if the record reveals "no rational basis, by way of argument or evidence, by which the jury could have distinguished between [the acts which would constitute the offenses]." (*People v. Deletto* (1983) 147 Cal.App.3d 458, 473 [195 Cal.Rptr. 233]; see *People v. Matute* (2002) 103 Cal.App.4th 1437, 1450 [127 Cal.Rptr.2d 472].) In contrast, if there is a rational basis on which jurors could distinguish between alternative factual bases, omission of a unanimity instruction is normally reversible error.

Although we agree the court should have given the instruction as requested, we find no prejudice. Here, as in *People v. Matute, supra*, 103 Cal.App.4th at page 1449, "the number of counts brought against [defendant] and the time frame at issue were clearly explained to the jury, and the prosecutor pointed to the evidence which amply supported the number of counts. It was not a random number, but rather was one that was tied to the time frame involved and was more than adequately supported by [the victim's] unequivocal testimony that a week never went by without a rape occurring. There could be no confusion in the jury's mind that they were being asked to decide whether" defendant raped, or at least engaged in sexual conduct with, the victim on five occasions over the period of time from April to August 2008. The sexual incidents as testified to by both the victim and defendant were relatively indistinguishable from one another. The court

instructed the jury: "Your verdict must be unanimous. This means that to return a verdict, all of you must agree to it." Finally, defendant confessed on the stand to as many as five times the number of offenses of which he was convicted. Thus, "[i]t is not reasonably probable that a result more favorable to appellant would have been reached in the absence of the instructional error because there is no reasonable possibility the jury failed to unanimously agree that appellant committed each specific act for which he was convicted." (*Matute*, at p. 1450.)

## DISPOSITION

The judgment is affirmed.

King, Acting P. J., and Codrington, J., concurred.