Filed 9/5/13  P. v. Gonzalez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054599 |
| v. | (Super.Ct.No. FVA900485) |
| CHARLES GONZALEZ et al., | O P I N I O N |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Dwight W. Moore, Judge.  Affirmed in part and reversed in part with directions.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant Charles Gonzalez.

David P. Lampkin, under appointment by the Court of Appeal, for Defendant and Appellant Frank Marshall Martinez.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Barry Carlton, Peter Quon, Jr., and Anthony Da Silva, Deputy Attorneys General, for the Plaintiff and Respondent.

## I.  INTRODUCTION

A jury found defendants Charles Gonzalez and Frank Marshall Martinez guilty as charged of the premeditated, attempted murders of Lamar Clemmons and Derek Edwards (counts 1 & 2), assaulting Clemmons and Edwards with a firearm (counts 3 & 4), and the second degree robbery of Edwards (count 5).  (Pen. Code, §§ 664, 187, subd. (a), 245, subd. (a)(2), 211.)[1]  The jury found multiple firearm enhancements true in each count, and great bodily injury (GBI) enhancements against Martinez in counts 4 and 5. (§§ 12022.53, subds. (b), (c), (d), 12022.5, subd. (a), 12022.7, subd. (a).)  Gonzalez was sentenced to 54 years to life, and Martinez was sentenced to 59 years to life.

We reverse Martinez's conviction in count 1 and Gonzalez's convictions in counts 2 and 4 based on insufficient evidence.  The prosecution tried the case based solely on the theory that each defendant directly perpetrated each attempted murder and each firearm assault on each victim.  Hence no aiding and abetting instructions were given on counts 1 through 4; they were only given on the robbery charge in count 5.  As will appear, this was a mistake on the part of the prosecution.

We also agree Gonzalez is entitled to three days of additional presentence custody credits (1,048 days, not the 1,045 awarded), and a new minute order and corrected

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

2

abstract of judgment must be issued to show that Gonzalez's personal use enhancement in count 3 is based on section 12022.5, subdivision (a), not section 12022.53, subdivision (b), because assault with a firearm is not an offense listed in section 12022.53, subdivision (a). We reject defendants' other claims of error, affirm the judgment in all other respects, and remand the matter for resentencing.

## II. FACTUAL AND PROCEDURAL BACKGROUND

A. *Prosecution Evidence*

The crimes occurred during the early morning hours of March 11, 2009. The victims, Clemmons and Edwards, were friends from Illinois and had known each other for many years. Edwards met Martinez during 2007 when they were in federal custody in Kansas and assigned to the same drug treatment program. They became friends and gambled together. At some point Edwards told Martinez he expected to receive around $14,000 from a social security settlement upon his release from federal custody in November 2008.

Between November 2008 and March 9, 2009, Edwards and Martinez had several telephone conversations and exchanged several text messages. Martinez was in California, and Edwards told Martinez he had received the settlement money and wanted to visit him in California. Martinez encouraged Edwards to come to California. He told Edwards they could hang with girls, then head to Las Vegas to gamble. Edwards invited Clemmons to come along and bought an airline ticket for Clemmons.

3

On March 10, Edwards and Clemmons flew into Los Angeles International Airport (LAX) on separate flights. Edwards arrived first and met Martinez outside the terminal at 9:00 p.m., bringing with him $9,000 from the settlement.[2] Martinez was in the passenger seat of a black Lexus. Gonzalez was driving the Lexus and introduced himself as "Chucky." Martinez introduced Gonzalez as his "bro." Edwards's bag was placed in the trunk of the Lexus. Shortly thereafter Clemmons arrived, bringing with him $2,800 and a bag containing a laptop computer, a digital camera, and clothing that was also placed in the trunk of the Lexus.

After leaving LAX, the four men briefly stopped at the home of a female friend of defendants, then had dinner in Azusa. After dinner, they drove around for a while before stopping at a gas station in Fontana shortly before 1:00 a.m. The cashier recalled seeing all four men at the gas station and helping two of them with purchases. A video surveillance recording showed the men at the gas station at 12:54 a.m. on March 11. At the gas station, Gonzalez changed out of his blue Los Angeles Dodgers jacket and put on a flannel jacket and gloves, saying that he had arthritis in his hands.

When they left the gas station, Gonzalez was driving, Martinez was in the front passenger seat, Clemmons was in the backseat behind Gonzalez, and Edwards was in the backseat behind Martinez. Edwards said he wanted to go to a motel to sleep and shower before leaving for Las Vegas the next morning. Gonzalez drove for approximately 8 to 10 minutes up a two lane dirt road on a mountain or hill. It was extremely dark, and no

---

[2] Edwards did not tell Martinez how much money he would be bringing with him.

4

street lights, cars, or people were visible for miles. Gonzalez and Martinez were saying, "'There's nothing out here.'"

Gonzalez then pulled the car over. Martinez quickly turned around and pointed a gun at Clemmons and Edwards, saying, "'All right, motherfuckers.'" Clemmons opened the rear driver's side door and ran away from the car towards an open field. Gonzalez then got out of the car, fired several shots at Clemmons from "right outside the vehicle," and chased after Clemmons. Edwards saw a gun in Gonzalez's hand, heard four or five shots, and saw the gunfire.

As Gonzalez was shooting at Clemmons, Martinez and Edwards were still in the car. Edwards estimated Gonzalez shot at Clemmons for "no longer than a minute or so" or "a couple [of] minutes." After Gonzalez stopped shooting at Clemmons, Edwards got out of the car and ran in the same direction as Clemmons. Edwards knew he followed "the same exact path" as Clemmons because he and Clemmons discussed their experience afterward. Martinez then got out of the car and fired four or five shots *at Edwards* as Edwards ran. As he was running, Edwards heard four or five shots. One of the shots hit Edwards in the middle of his lower back, and he fell to the ground 15 to 30 feet from the car, unable to move his leg. Edwards acknowledged he did not actually see Martinez shoot him, but testified he believed Martinez shot him because, he said, "it was only two people out there at that point."

As Clemmons was running away, he heard three or four shots, then felt pain in his back and buttocks. He did not look back or see a gun in Gonzalez's hand, but believed

5

Gonzalez was chasing him and shot him because Gonzalez was in the driver's seat, and Clemmons heard the driver's door shut just after he got out of the car and began running. Clemmons continued running after he had been shot. As he continued running, he heard three or four more gunshots, then heard Edwards yell "'Ah.'"

As Edwards lay on the ground, Martinez walked up to him, still carrying a gun and aimed it at Edwards. Martinez ordered Edwards to give him the money. Edwards reached into his pocket, pulled out some money, and threw it at Martinez. Martinez asked where the rest of the money was, and Edwards told him it was in his bag in the trunk of the car.[3] Gonzalez also walked up to Edwards but *from the opposite direction* as Martinez, and with a gun still in his hand stood near Edwards while Martinez demanded the money from Edwards. Martinez then asked Edwards, "'Did I shoot you?'" or "'I shot you.'" Edwards responded "'[y]es'" and that "'[i]t's all right,'" not wanting Martinez to know he was seriously injured. Martinez and Gonzalez then walked back to the car.

Martinez and Gonzalez briefly spoke to each other near the trunk of the car, then got into the car and drove away. Edwards called 911 with his cell phone, but the police were unable to find his location and he had no idea where to tell them he was. Edwards then called Martinez and left a message, hoping Martinez would come back and take him to the hospital. Edwards feared he would bleed to death. Edwards estimated that 30 minutes passed between the time they left the gas station and he was shot.

---

[3] The money was not in Edwards's bag; it was in his wallet in his back pocket.

Michael Landmesser lived in a home approximately one mile from the scene of the shootings. He was sleeping at 1:20 a.m. when he heard pounding on his front door. He went to the door and saw Clemmons screaming that he had been shot and his friend was lying on a road nearby. Landmesser called 911, and officers arrived at his house within minutes. Clemmons was shot in the buttocks and had $2,264 on his person. He was taken to the hospital and treated for the gunshot wound and a fractured pelvis.

After officers spoke with Clemmons, they found Edwards lying face down on a dirt road off of Lytle Creek Road, bleeding from a gunshot wound to his lower back and slipping in and out of consciousness. Edwards told an officer that Martinez shot him. He had $8,217 and two cell phones on his person. A third cell phone was found where the shootings took place. Edwards was treated at the hospital, and suffered permanent nerve damage in his lower back and leg.

Later during the day on March 11, 2009, police officers went to the gas station in Fontana to view and retrieve surveillance videotapes. The videotapes showed Gonzalez in his blue Los Angeles Dodgers jacket near the entrance to the gas station, and Martinez standing in front of the counter inside the gas station. They also showed Clemmons entering the gas station and Edwards in the doorway of the gas station. Martinez's mother identified Martinez and Gonzalez from still photographs taken from the videotapes.

Also later during the day on March 11, 2009, the day of the shootings, Clemmons met with a detective and identified Martinez from a six-pack photographic lineup. After

7

some confusion, Clemmons also identified Gonzalez from another six-pack photographic lineup. At trial, Clemmons explained that another person in the same photographic lineup as Gonzalez looked like Gonzalez, but was not Gonzalez. The person Clemmons thought looked like Gonzalez was Martinez's brother, Cisco Viramontes. Viramontes was arrested in connection with the case but police later stopped investigating him.

Edwards met with the same detective on March 11, 2009, was shown the same photographic lineup that was shown to Clemmons, and also told the detective that the photograph of Viramontes looked like the driver. Edwards later identified Gonzalez as the driver, however. Gonzalez was arrested on March 26, 2009, in San Diego, and Martinez was arrested on August 14, 2009, in Mexicali.

B. *Defense Case*

The defense did not call any witnesses or present any affirmative evidence. In closing argument, neither defense counsel connected the elements of the charges with the evidence. Instead, both counsel claimed each victim's testimony was unreliable. Counsel for Gonzalez also emphasized that both victims initially believed Viramontes might have been the driver, and that Clemmons initially believed the driver was Black while Gonzalez is Hispanic.

C. *The Verdicts and Findings*

The jury found each defendant guilty as charged on all five counts—the attempted murders of Clemmons and Edwards in counts 1 and 2, assaulting Clemmons and Edwards with a firearm in counts 3 and 4, and the robbery of Edwards in count 5. (§§ 664, 187,

8

subd. (a), 245, subd. (a)(2), 211.)  The jury also found the attempted murders were premeditated.  (§ 664, subd. (a).)  Multiple firearm enhancement allegations were also found true in each count.

Specifically, in counts 1 through 5, the jury found that each defendant personally used a firearm.  (§§ 12022.53, subd. (b), 12022.5, subd. (a).)  And in counts 1, 2, and 5, the jury found each defendant personally discharged a firearm.  (§§ 12022.53, subd. (c), 12022.5, subd. (a).)  In counts 2 and 5, the jury found that Martinez personally discharged a firearm causing GBI to Edwards (§§ 12022.53, subd. (d), 12022.5, subd. (a)), and in counts 4 and 5, that Martinez personally inflicted GBI on Edwards (§ 12022.7, subd. (a)).

In count 1, the jury deadlocked and a mistrial was declared on whether Gonzalez personally discharged a firearm causing GBI to Clemmons.  (§ 12022.53, subd. (d).)  And in count 3, the jury deadlocked and a mistrial was declared on whether Gonzalez personally inflicted GBI on Clemmons.  (§ 12022.7.)  Thus, no section 12022.53, subdivision (d) (discharge causing GBI) or 12022.7 (GBI) enhancements were found true against Gonzalez.

D.  *The Sentences*

Gonzalez was sentenced to 54 years to life in prison—consecutive seven-year-to-life terms on counts 1 and 2, plus 20 years for each personal discharge enhancement on counts 1 and 2.  His personal use enhancements on counts 1 and 2 were stricken, and additional terms were imposed but stayed on counts 3, 4, and 5.

Martinez was sentenced to 59 years to life—consecutive seven-year-to-life terms on counts 1 and 2, plus 25 years to life for the section 12022.53, subdivision (d) enhancement on count 2, plus 20 years for the personal discharge enhancement on count 1.  Martinez's personal use enhancement on count 1 was stricken, and his personal discharge and personal use enhancement on count 2 were also stricken.  Additional terms were also imposed but stayed on counts 3 through 5.

## III.  DISCUSSION

A.  *Insufficient Evidence Supports Martinez's Conviction in Count 1 (for the Attempted Murder of Clemmons) and Gonzalez's Convictions in Counts 2 and 4 (for the Attempted Murder and Firearm Assault on Edwards) Based on Direct Perpetrator Theories*

Significantly, no aiding and abetting instructions were given on counts 1 through 4; they were only given on the robbery charge in count 5.  Reflecting this omission in the instructions, the prosecutor claimed Gonzalez aided and abetted Martinez's direct perpetration of the robbery of Edwards in count 5, but she did not argue that either defendant aided and abetted the other in counts 1 through 4.  Instead, she claimed each defendant directly perpetrated each attempted murder and each firearm assault on each victim charged in counts 1 through 4.

At our request, the parties submitted supplemental briefs addressing whether sufficient evidence supports Martinez's conviction in count 1 (for the attempted murder of Clemmons) and Gonzalez's convictions in counts 2 and 4 (for the attempted murder and firearm assault on Edwards) based on direct perpetrator theories.  We conclude the

10

evidence is insufficient to support these convictions based on direct perpetrator theories. This is because there is no evidence that Martinez shot at Clemmons or that Gonzalez shot at Edwards or pointed a gun at Edwards.

    1. <u>Standard of Review/Sufficiency of Evidence</u>

    In considering whether sufficient evidence supports a criminal conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty of the crime beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We presume in support of the judgment every fact the trier of fact could reasonably deduce from the evidence. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) Reversal is warranted only when "'upon no hypothesis whatever'" is there sufficient evidence to support the conviction. (*People v. Bolin* (1998) 18 Ca1.4th 297, 331.)

    2. <u>Analysis</u>

    Because no aiding and abetting instructions were given in counts 1 through 4, the jury had to find that each defendant directly perpetrated each attempted murder and each assault with a firearm against each victim, in order to find defendants guilty as charged in counts 1 through 4. And here, the jury could reasonably conclude that each defendant directly perpetrated each attempted murder only if it concluded each defendant shot at

11

each victim, and that each defendant directly perpetrated each firearm assault only if it concluded each defendant pointed a gun at each victim.**⁴**

Viewed as a whole and in the light most favorable to the jury's verdicts, however, the evidence does not support a reasonable inference that Martinez shot at Clemmons (count 1), that Gonzalez shot at Edwards (counts 2 & 4), or that Gonzalez pointed a gun at Edwards (count 4). Instead, the evidence shows that Martinez pointed a gun at both victims inside the car before the shootings began and said, "'All right, motherfuckers.'" Clemmons then got out of the car and ran. Gonzalez got out of the car and fired several shots at Clemmons and chased Clemmons, who continued to run after he was hit by a shot Gonzalez fired. After Gonzalez stopped shooting at Clemmons, Edwards got out of the car, followed by Martinez. Martinez then fired several shots at Edwards, hitting him and causing him to fall only 15 to 30 feet from the car. There is *no evidence* Martinez shot at Clemmons or that Gonzalez shot at Edwards or pointed a gun at Edwards.

---

**⁴** On the attempted murder charges, the jury was instructed the People had to prove: "1. The defendant took at least one direct but ineffective step toward killing another person; [¶] AND [¶] 2. The defendant intended to kill that person." (CALCRIM No. 600; see *People v. Campos* (2007) 156 Cal.App.4th 1228, 1241.)

On the assault with a firearm charges, the jury was instructed the People had to prove: "1. The defendant did an act with a firearm that by its nature would directly and probably result in the application of force to a person; [¶] 2. The defendant did that act willfully; [¶] 3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; [¶] AND [¶] 4. When the defendant acted, he had the present ability to apply force likely to produce great bodily injury with a firearm." (CALCRIM No. 875; see *People v. Golde* (2008) 163 Cal.App.4th 101, 120-123.)

12

The People point out Edwards ran in the same direction Clemmons ran, and on this basis argue that when Martinez shot at Edwards he was also shooting at Clemmons. This argument is based on a false, over-generalized, view of the evidence and ignores critical details in the evidence. The evidence shows Clemmons had already run away by the time Martinez got out of the car and began shooting at Edwards. Edwards testified there were "only two people out there at that point" namely, himself and Martinez. The area was unlit and it was completely dark outside. There was therefore no basis to infer Martinez could see Clemmons in the distance when Martinez shot at Edwards, or that Martinez intended to shoot at Edwards. (CALCRIM No. 600.) In addition, Edwards was only 15 to 30 feet away from Martinez when he fell to the ground with a gunshot wound, and at that point Martinez stopped shooting. This further indicates that Martinez only intended to shoot at Edwards, not at Clemmons.

The People misstate the evidence even further in arguing that "Gonzalez and Martinez both stood outside the car and fired six to ten shots at Edwards and Clemmons, who both travelled the same path as they ran from the shooters." There is no evidence Gonzalez and Martinez stood outside the car *together*, at or near the same time, and shot at both victims as the victims ran down the same path. To the contrary, Gonzalez shot at Clemmons and chased after Clemmons *before* Edwards or Martinez got out of the car, and Martinez shot at Edwards *after* Clemmons and Gonzalez were no longer near the car and were apparently out of sight. In addition, both Edwards and Clemmons heard two separate rounds of shots fired, and their testimony consistently showed Gonzalez fired the

13

first round of shots at Clemmons before Martinez fired the second round of shots at Edwards.

The People's arguments also disregard the evidence that Martinez and Gonzalez walked up to Edwards *from opposite directions* as he lay on the ground with a gunshot wound. Martinez walked from the direction of the car, while Gonzalez walked from the direction Clemmons ran—and in which Edwards was heading when he was shot. This evidence—in combination with each victim's testimony that Gonzalez fired the initial round of shots and Martinez fired the second, and that Gonzalez chased Clemmons immediately after Gonzalez shot at Clemmons—showed Gonzalez could not have shot at and did not shoot at Edwards. Nor is there any evidence that Gonzalez pointed his gun at Edwards as Edwards lay on the ground, or at any other time.

The prosecutor advanced a similar overly-general view of the evidence in her closing remarks to the jury, telling them: "They [defendants] fired six to ten shots at [Edwards] and [Clemmons]"; "After [Edwards] and [Clemmons] jumped out of the car and started running, . . . Martinez was shooting at both of them"; "[Martinez] fired a gun at [Clemmons]"; and "[Martinez] shot at [Clemmons] repeatedly, not one time, not two times, not three times—over and over—shot at [Clemmons] while he was running away . . . ."

As Martinez points out, the prosecutor's argument "paid scant attention to the details of the evidence." The argument likely explains why the jury found each

14

defendant guilty as direct perpetrators in counts 1 through 4—that and defense counsels' failure to point out the liberties the prosecutor was taking with the evidence.

Also contrary to the People's claim, Clemmons did not testify that he heard a third round of shots fired after he heard Edwards yell "'Ah.'" To the contrary, Clemmons testified he heard an initial round of shots, felt pain from a gunshot wound, and continued to run. Then he heard two or three more shots and heard Edwards yell "'Ah,'" as if Edwards was in pain. He *did not* testify he heard a third round of shots after Edwards yelled "'Ah.'"

Lastly, the People point out that shortly after the shootings, Edwards told Fontana Police Officer Daniel Delgado "that he saw both Gonzalez and Martinez shooting at Edwards and Clemmons," and Edwards testified at trial, "That's a correct statement as to what happened." The People argue this testimony amounts to substantial evidence that each defendant shot at each victim, but the People are mistaken. First, the statement is ambiguous and can reasonably be understood to mean that each defendant shot at only one victim. Moreover, and as discussed, the evidence *as a whole* shows Martinez pointed his gun at both victims and shot at Edwards, and that Gonzalez shot at Clemmons, but it does not support a reasonable inference that Martinez shot at Clemmons or that Gonzalez shot at Edwards or pointed a gun at Edwards.

B. *No Unanimity Instructions Were Required on Counts 1 Through 4*

Martinez further claims his attempted murder and firearm assault convictions in counts 1 through 4 must be reversed because the court erroneously failed to instruct the

15

jury on unanimity sua sponte. (CALCRIM No. 3500.)[5] He argues one or more jurors could have found him guilty of each crime based on his initial act of pointing his gun at the victims inside the car, while others could have based their verdicts on his act of shooting at the victims outside the car. Gonzalez joins this claim without additional argument.

The claim does not benefit Gonzalez because he stands convicted only in counts 1, 3, and 5, and there is no evidence he pointed a gun at Clemmons (count 3) other than when he shot at Clemmons (count 1). Thus there are not two separate acts upon which the jury could have found Gonzalez guilty in counts 1 and 3. Although we reverse Martinez's conviction in count 1 because there is insufficient evidence he shot at Clemmons (count 1), we consider the unanimity claim as it relates to Martinez's convictions in counts 1 and 3 (Clemmons) and counts 2 and 4 (Edwards), given that the jury found him guilty on each of these counts and the prosecutor argued he both pointed his gun and later shot at both victims.

1. The Unanimity Requirement

"In a criminal case, a jury verdict must be unanimous. [Citations.] . . . Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than

---

[5] CALCRIM No. 3500 provides, in part: "The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed."

16

one discrete crime, either the prosecution must elect among the crimes *or the court must require the jury to agree on the same criminal act*.  [Citations.]"  (*People v. Russo* (2001) 25 Cal.4th 1124, 1132, second italics added.)

"On the other hand, where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty."  (*People v. Russo, supra,* 25 Cal.4th at p. 1132.)  Thus, a unanimity instruction is required to be given by the court sua sponte, "when the circumstances [of the case] so warrant."  (*People v. Davis* (2005) 36 Cal.4th 510, 561.)

Courts have long recognized a "continuous-course-of-conduct exception" to the unanimity instruction requirement.  (See, e.g., *People v. Jennings* (2010) 50 Cal.4th 616, 679.)  The exception applies, for example, "when (1) 'the acts are so closely connected in time as to form part of one transaction,' (2) 'the defendant tenders the same defense or defenses to each act,' and (3) 'there is no reasonable basis for the jury to distinguish between them.  [Citations.]'"  (*People v. Lueth* (2012) 206 Cal.App.4th 189, 196 [Fourth Dist., Div. Two], quoting *People v. Crandell* (1988) 46 Cal.3d 833, 875.)

This particular branch of the continuous-course-of-conduct exception—we will call it the single transaction branch—"'"'is meant to apply not to all crimes occurring during a single transaction but only to those 'where the acts testified to are so closely related in time and place that the jurors reasonably must either accept or reject the

17

victim's testimony in toto.' [Citation.]" [Citation.]' [Citation.]" (*People v. Bui* (2011) 192 Cal.App.4th 1002, 1011.) After all, the unanimity requirement "'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' [Citation.]" (*People v. Russo, supra,* 25 Cal.4th at p. 1132.)

Last year, in *People v. Lueth, supra,* 206 Cal.App.4th at page 196, this court questioned whether the single transaction branch of the continuous conduct exception is truly an exception to the unanimity requirement, or whether it would be "more accurate to say that, in this situation, a unanimity instruction is required but the failure to give one is harmless." In *People v. Arevalo-Iraheta* (2011) 193 Cal.App.4th 1574 at page 1589 [Fourth Dist., Div. Two], this court observed: "[T]he omission of a unanimity instruction [is] harmless if the record reveals 'no rational basis . . . by which the jury could have distinguished between [the acts which would constitute the offenses].'"

We independently review a claim that the trial court erroneously failed to give a unanimity instruction when one was required. (*People v. Lueth, supra,* 206 Cal.App.4th at p. 195.) "The omission of a unanimity instruction is reversible error if, without it, some jurors may have believed the defendant guilty based on one act, while others may have believed him guilty based on another." (*People v. Arevalo-Iraheta, supra,* 193 Cal.App.4th at p. 1589; *People v. Russo, supra,* 25 Cal.4th at pp. 1132, 1135.)

18

2. <u>Analysis</u>

We conclude no unanimity instructions were required to be given on counts 1 through 4 because no reasonable juror could have found Martinez guilty in counts 1 through 4 based *solely* on his act of pointing his gun at the victims in the car. Though the evidence is insufficient to support a reasonable inference that Martinez shot at Clemmons, no juror could have rationally believed Martinez shot at *either victim* outside the car but did not also point his gun at both victims inside the car. Martinez's initial act of pointing his gun at both victims inside the car and his later act of shooting (at Edwards) outside the car were part of a continuous course of conduct.

To be sure, the prosecutor argued that Martinez's initial act of pointing his gun at the victims inside the car, standing alone, satisfied the direct act element of the attempted murder charges *and* all four elements of the assault charges. But she did not differentiate the gun pointing from the shooting, which happened minutes later. She did not argue that pointing the gun was an alternative or independent basis for the charges. Instead she emphasized that the act of *shooting* showed intent to kill, constituted a direct act toward the commission of the killings, *and* constituted assault with a firearm.

In addition, neither defense counsel attempted to draw any distinction between Martinez's initial act of pointing the gun at both victims from the subsequent shootings. Gonzalez instead argued he had been mistaken for his brother and misidentified and was not present at the time of the crimes. And Martinez argued the testimony of each victim was wholly unreliable. In these circumstances it is difficult to see how the jurors could

19

have split their verdicts in counts 1 and 3 or in counts 2 and 4 based on Martinez's initial

act of pointing the gun at both victims inside the car the and the subsequent shootings.

This case presents the type of scenario in which the "single transaction" branch of

the continuous-course-of-conduct exception applies. Not only were Martinez's acts of

pointing and then shooting his gun """"'so closely related in time and place that the jurors

reasonably must [have] either accept[ed] or reject[ed] the victim[s'] testimony in toto,'"""

the jurors could not have drawn any rational distinction between them in finding

Martinez guilty of the firearm assaults and attempted murders. (*People v. Bui, supra,* 192

Cal.App.4th at pp. 1010-1011.) Thus there is no risk the jurors could have divided "as to

the exact way" that Martinez committed each crime. (*People v. Russo, supra,* 25 Cal.4th

at p. 1135.) Instead, the jurors must have unanimously concluded that Martinez

committed both acts if he committed either. (See *People v. Riel* (2000) 22 Cal.4th 1153,

1199 [jurors must have found the defendant committed two robberies].)

By the same token, any error in failing to instruct on unanimity was necessarily

harmless because "the record reveals 'no rational basis, by way of argument or evidence,

by which the jury could have distinguished between [the acts which would constitute the

offenses].'" (*People v. Arevalo-Iraheta, supra,* 193 Cal.App.4th at p. 1589.)

C. *Mootness of Failure to Allege Personal Discharge Allegations in Counts 1 and 2*

Martinez claims his 20-year personal discharge enhancement on the attempted

murder of Clemmons in count 1 (§ 12022.53, subd. (c)) must be stricken because it was

not alleged in the information, and this violated section 12022.53, subdivision (j) and his

due process rights to fair notice of the enhancement. For the same reasons, Gonzalez claims his 20-year personal discharge enhancement on the attempted murder of Edwards in count 2 must be stricken. (§ 12022.53, subd. (c).)[6] These claims are moot given our reversal of Martinez's conviction in count 1 and Gonzalez's conviction in count 2, and remand for resentencing.

D. *Gonzalez is Entitled to Three Additional Days of Presentence Custody Credits*

Gonzalez claims the judgment should be modified to award him a total of 1,048 days of presentence custody credits instead of the 1,045 awarded at sentencing, because the court incorrectly calculated the time he was incarcerated in county jail. We agree.

Gonzalez was incarcerated in county jail from his arrest on March 26, 2009, to and including the date of sentencing on September 23, 2011. He was awarded 909 actual days of credit and 136 days of conduct credit (calculated at 15 percent pursuant to § 2933.1 because Gonzalez received a life term). He claims he should have been awarded 912 days of actual credit rather than 909 days based on the number of days he was incarcerated. He is correct. The period between March 29, 2009 and September 23, 2011, is 912 days, not 909 days.

The People do not dispute that Gonzalez should have received the additional three days' credit, but argue the proper remedy is to allow the trial court to calculate the credits because the duty to calculate credits lies with the sentencing court. (*People v. Buckhalter*

---

[6] Gonzalez also claims his 10-year *use* enhancement in count 2 must be stricken (§ 12022.53, subd. (b)), but it was stricken after the court imposed the 20-year discharge enhancement in count 2.

21

(2001) 26 Cal.4th 20, 23, 29, 41.)  The trial court's duty to calculate credits does not subsume this court's authority to modify the judgment, however.  (§ 1260.)  Rather than subject the trial court and the parties to an unnecessary expense, we exercise our authority to amend the judgment to add the missing three days of actual custody credit. (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1473; § 1260.)

E.  *Supplemental Sentencing Order and Amended Abstract of Judgment*

Gonzalez correctly points out that the sentencing minute order of January 7, 2010, and his abstract of judgment are in error because they reflect that his personal use enhancements in counts 3 and 4 were found true and imposed pursuant to section 12022.53, subdivision (b).  The statutory basis for these personal use enhancements is actually section 12022.5, subdivision (a).  Assault with a firearm (§ 245, subd. (a)(2)) is not a felony listed in section 12022.53, subdivision (a), and section 12022.5, subdivision (a) authorizes personal use enhancements on other felonies.  At resentencing, the court is directed to correct these error in its records and in the abstract of judgment.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

## IV.  DISPOSITION

Martinez's conviction in count 1 and Gonzalez's convictions in counts 2 and 4 are reversed based on insufficient evidence, and the matter is remanded for resentencing. The court's sentencing minute order and the abstract of judgment should reflect that (1) Gonzalez's personal use enhancements in counts 3 and 4 were found true pursuant to section 12022.5, subdivision (a), not section 12022.53, subdivision (b), and (2) Gonzalez

is entitled to 912 days' presentence custody credits, not 909 days, or a total of 1,048 days custody credits, not 1,045 days.  In all other respects, the judgments are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING
                                                                                              J.


We concur:

McKINSTER
                    Acting P. J.

RICHLI
                    J.