Filed 12/30/13  P. v. Turner CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH DUANE TURNER,<br><br>        Defendant and Appellant. | A134275<br><br>(Contra Costa  County<br>Super. Ct. No. 1109529) |

A jury convicted appellant Joseph Duane Turner of two counts of first degree residential robbery (Pen. Code,[1] §§ 211, 212.5, subd. (a)), one count of first degree residential burglary (§§ 459, 460, subd. (a)), three counts of false imprisonment (§§ 236, 237, subd. (a)), and one count of criminal threats (§ 422).  The jury also found true the allegations that he committed the offenses with a firearm (§ 12022, subd. (a)(1)).  The trial court sentenced appellant to seven years in state prison.  Appellant complains of *Faretta*[2] error, discovery abuse, evidentiary error, and an untimely amendment to the information.  We affirm.

## I. EVIDENCE AT TRIAL

### A.    *The Charged Offenses*

In the early morning hours of April 21, 2011, a home invasion robbery occurred at a residence on Pearce Street in Hercules, California.  Romeo Sapinoso lived at the house

---

[1]    All further undesignated statutory references are to the Penal Code.

[2]    *Faretta v. California* (1975) 422 U.S. 806.

1

with his girlfriend, Fernanda Cunha, a Brazilian national, and his nephew, Joseph Sapinoso.[3] Also at the house was Cunha's cousin, Fernanda Rodrigues, who was visiting from Brazil.[4]

At 3:50 a.m., Cunha was awakened by her dogs barking. Two men with guns walked into her bedroom. One gunman was an Asian male, who was fat, short, and bearded. The other gunman was tall, dark-skinned, and had a low voice. The gunmen wore black clothes, gloves, and beanies. The gunmen ordered Romeo to the floor. Cunha heard her cousin scream, and then saw the gunmen lead her cousin into Cunha's bedroom. The gunmen bound both women with tape. Cunha heard the men open drawers and take items. She heard other people downstairs. The gunmen took jewelry, Cunha's purse, her computer, watches, Cunha's cell phone, an iPad, and marijuana. Cunha kept marijuana in a transparent Tupperware container.

Romeo testified that he was awakened by screams and saw two men—one black and the other Filipino or Polynesian—enter his bedroom carrying guns. The black gunman gave Romeo a sock and told him to put it into his girlfriend's mouth. Both men ordered Romeo to the ground, then bound his hands behind his back with handcuffs. The black man left the bedroom, reentered it with Rodrigues, then ordered her to get into the bed with Cuhna. The men bound the women with tape. Romeo's nephew, Joseph, called out and Romeo told him to go back into his bedroom. Romeo testified that the gunmen took $4,200, a laptop computer, jewelry, a purse, and a Tupperware container of marijuana. At some point, Romeo heard the Polynesian gunman make a cell phone call and say, " 'Boss, [ ] we're inside.' " After the noises stopped, Romeo got up, went to the hallway, and saw someone wearing a jacket with stripes walk out and close the front door.

---

[3]  We shall refer to Romeo and Joseph Sapinoso by their first names for purposes of clarity and intend no disrespect.

[4]  At the time of trial, Rodrigues had returned to Brazil. As such, portions of her testimony from the preliminary hearing were read to the jury.

After declaring Rodrigues unavailable for trial, Rodrigues's preliminary hearing testimony was read to the jury. Rodrigues testified that she was awakened by dogs barking. A man with a gun walked into her bedroom, covered her head with a blanket, and led her into her cousin's room. The gunman bound Rodrigues's hands and feet with tape.

Joseph, who was asleep in his own bedroom, was awakened to the sounds of a woman screaming and a dog barking. Joseph got up, opened his bedroom door, and heard his uncle say, " 'It's okay. Don't trip. Just go back inside your room.' " From the space under his bedroom door, Joseph saw flashlights going by and a figure. Joseph saw a tall, white man, wearing black clothes. Joseph heard the sounds of tape being ripped and people rummaging all around the house. Joseph pretended to be asleep, and heard someone open his bedroom door and then close it.

Believing a robbery was occurring, Joseph got up out of bed and jumped out his bedroom window onto a neighbor's roof. From the roof, Joseph saw appellant, who was about five or six feet away, peek out a window at him. Appellant said, " 'Get back down here or I'll shoot you. And I have your sisters inside.' " Joseph jumped down from the roof, hid in some bushes, and then called 911 for help. Joseph identified the 911 recording, which was played for the jury. Joseph identified appellant after appellant said a few words in the presence of the police at the scene. At a subsequent in-field show-up, Joseph again identified appellant as the man who threatened to shoot him. Joseph lost his iPad in the robbery.

**B.**    ***Police Investigation***

    *1.*    *At the Scene*

Corporal Joseph Vasquez of the Hercules Police Department arrived at the scene shortly after 4:00 a.m. Corporal Vasquez heard a woman scream, then saw appellant walking from Pearce Street toward Skelly Street. Appellant was wearing a black jacket with white stripes and was holding a clear Tupperware container that was partially concealed in a black garbage bag. Corporal Vasquez ordered appellant to stop, but he turned and walked in the opposite direction. After Corporal Vasquez repeated the order

to stop, appellant complied, and walked toward the officer. The Tupperware container had five ounces of marijuana in it. Appellant reported that while he was out walking with friends, he heard a woman scream and then he found the Tupperware container abandoned on a driveway. Appellant, who happened to be wearing latex gloves and had a roll of black garbage bags inside a pocket, picked up the Tupperware container. Appellant also had a cell phone in his possession. Appellant was detained as a suspect.

Corporal Vasquez saw Sergeant Ezra Tafesse contact Joseph, who appeared frantic and reported that he had been robbed. Joseph asked to hear appellant speak before making an identification. From a window at the residence, Corporal Vasquez saw Romeo who reported that his hands were handcuffed. Two women came outside of the residence, who seemed visibly frantic and frightened. The residence appeared ransacked. Corporal Vasquez saw marijuana inside two bags on the pool table, inside a blue tub, and inside a black plastic bag. Altogether, three-fourths of a pound of marijuana was seized from inside the residence. Corporal Vasquez determined that a garage door had been forced open and found a pry bar on the ground near the door. Corporal Vasquez saw plastic packaging tape on the floor in one bedroom. Corporal Vasquez identified photos of appellant at the time of his arrest, including a photo depicting him wearing latex gloves.

Sergeant Tafesse testified that he saw a silver-colored Toyota Highlander leaving the area near 190 Pearce Street. Sergeant Tafesse saw appellant walking east on Pearce Street, approaching Skelly. Appellant carried a large black plastic garbage bag. Sergeant Tafesse detained appellant. Joseph was hiding in the bushes using a cell phone. Joseph approached and was visibly upset. Joseph reported that appellant was involved in the robbery and had threatened to shoot him. Later, at an in-field show-up, Joseph again identified appellant. Romeo identified appellant as the individual, wearing the black jacket with white stripe, who was the last person to leave the house.

2.      *Appellant's Statements to Police and Subsequent Criminal Investigation*

Detective Alexander Abetkov testified that appellant waived his rights and made a statement. Appellant said he had been home asleep on the couch, when an unidentified

4

friend called at 3:00 a.m., saying he was downstairs in his car and asking appellant to come outside. Appellant went outside and got into his friend's car. The friend drove appellant to Pinole and stopped at a residence the friend claimed "was being robbed." Appellant saw flashlights being used inside the residence at 190 Pearce Street. Appellant's friend drove past the residence a couple of times and discussed with appellant "whether or not they were going to call the police or [whether] they were going to steal property from the people that were there robbing the house." Appellant's friend said stolen property had been placed outside on the driveway. Appellant believed there were two robbers inside the house because he saw two flashlights being used. The driver told appellant to put on latex gloves that were inside the car and to go out and pick up the loot in the driveway. Appellant went out and picked up the marijuana in the Tupperware container, as well as a roll of garbage bags. Appellant discovered that his friend had driven off. Appellant said his friend drove a small, dark-silver-colored SUV. Appellant later gave a different story to Corporal Vasquez. Appellant feared disclosing the identity of the male friend who drove him to the residence. Appellant's cell phone showed a series of calls to "D-Boy."

Detective Abetkov executed a search warrant for a Hercules residence associated with D-Boy's cell phone. D-Boy was identified as Tawn Saeteurn. Saeteurn's Celica was searched, as was a Toyota Highlander associated with Saeteurn's residence. A search of the Celica revealed a box of face masks and a bundle of latex gloves.

Initially, appellant denied planning the robbery or going inside the residence. Appellant admitted knowing about the robbery only minutes before arriving at the residence. Later, while searching appellant's residence, appellant told Detective Abetkov that he had more information. Expressing concern over his fate, appellant asked if he could provide more details about the robbery. Detective Abetkov explained that appellant was going to jail and that no promises would be made for any such information. Thereafter, appellant gave the following "hypothetical version" of events: "D-Boy owed some money to another individual, not a ridiculously large amount of money but a substantial amount, and that he knew that Mr. Turner was unemployed, and that D-Boy

5

had a crew that was doing robberies in the area, and that basically Mr. Turner could profit if he was able to provide a victim locally, maybe in Hercules, of a house that they could hit where they could get cash and whatever else they were looking for." Appellant told D-Boy that he had heard on the street that the residence contained cash and possibly drugs. Appellant said he merely passed this information to D-Boy and never intended to assist in any robbery. Eventually, appellant admitted that he agreed to go to the robbery with D-Boy. Once they arrived at the residence, appellant put on gloves and followed D-Boy inside. D-Boy told appellant to look around the house for loot. D-Boy showed appellant a text that reported, "the guy, the nephew, 15-year old, and two bitches, were tied up upstairs in the house." D-Boy gave appellant a Tupperware container with marijuana in it. Appellant went outside to get some air. While outside, appellant received a text from D-Boy saying they had to leave. Appellant reentered the house and saw two individuals leaving the residence, one of whom pointed a gun at appellant on the way out. In the end, appellant admitted he was inside the residence.

Cuhna's cell phone was located following a search of a residence in Richmond that was associated with an individual named Shameel Ali. D-Boy's cell phone showed texts were exchanged with the cell phone associated with Ali. Photos taken from Ali's residence led to the issuance of arrest warrants for Francis Tualaga Taylor, Jr., and Troy Alexander.

The jury viewed video-recordings of appellant's three taped statements.[5]

## C. Defense Case

Hercules Police Corporal John Gallegos testified that he took a statement from Joseph. Joseph reported that after he jumped out of the window, one suspect put his head out of the window and told Joseph to get back inside the residence. The suspect said, " 'We have the girls.' " Joseph said he could identify the suspect's clothing but could not identify the suspect's face.

---

[5] The video-recordings were not included with the record on appeal.

6

## II. DISCUSSION

### A.      *Self-Representation Request Properly Denied*

Appellant contends his conviction must be reversed because the trial court erroneously denied his *Faretta* motion on timeliness grounds. He alternatively argues that if the motion was untimely, the court abused its discretion when it failed to address the factors outlined in *People v. Windham* (1977) 19 Cal.3d 121 (*Windham*).

### 1.      *Background*

Trial was set to commence on November 21, 2011. At the November 16, 2011 readiness conference, defense counsel advised the court that appellant wanted to make a *Marsden*[6] motion. At the *Marsden* hearing, appellant claimed he needed a new attorney because: 1) his appointed counsel was not adequately prepared; 2) counsel's lack of preparation had interfered with a meaningful opportunity to resolve the case with a plea bargain; 3) counsel failed to get a reduction in bail; 4) counsel failed to engage in "aggressive" discovery; 5) counsel was unaware of appellant's version of the relevant events; and 6) the attorney-client relationship had broken down to such an extent that effective communication no longer occurred.

In response, defense counsel reported that he had practiced in the county for 11 years and had handled over 30 felony trials. Counsel explained that he advised appellant that the issue of identification would best be challenged at trial not by pretrial motion, and that a motion to dismiss the information was not applicable. Counsel further represented that the bail issue was subordinated to negotiating a reasonable disposition before possible amendment of the information or joinder with other co-participants. As to appellant's desire to testify, counsel said that he advised appellant that taking the stand would be detrimental, particularly given the circumstances that appellant was found at 4:00 a.m., wearing surgical gloves, and in possession of stolen property, a block away from the residence that was burglarized. Counsel said that he was "certain" that that he

---

[6]      *People v. Marsden* (1970) 2 Cal.3d 118.

could "adequately prepare" for the case, and would make himself available to discuss the evidence with appellant.

The trial court found that counsel was providing adequate representation and found no irreconcilable conflict. After the court denied appellant's motion for substitute counsel, appellant asked the court to allow self-representation. In response, the court gave the following admonition: "This is the eve of trial; and I don't necessarily have to grant your [*Faretta* request] unless you are prepared to proceed on Monday."

Appellant said that he "absolutely would not be prepared to proceed" to trial on Monday. The prosecutor objected to continuing the trial, representing that the victims would experience "extreme hardship" in that they were "Brazilian nationals and are waiting to go home for the holidays after this trial."

In denying the motion, the trial court ruled as follows: "Mr. Turner, I appreciate the fact that you would like to represent yourself; you have a federal constitutional right to represent yourself. And in order to invoke this unconditional right, you must assert it within a reasonable time prior to the commencement of trial. [¶] In considering the quality of your counsel's representation, I believe it to be strong—despite the fact that you criticize it. I find him to be an excellent attorney. And I am not speaking generally although I could speak of him generally—I am speaking in this case of the motions that he has filed and the work that he has done. [¶] I am finding that the timeliness issue–and considering the totality of the circumstances that exist at this time, I believe that you are misusing this motion to unjustifiably delay the trial and obstruct the ordinary administration of justice."

### 2. *Applicable Law*

"A defendant in a criminal case possesses two constitutional rights with respect to representation that are mutually exclusive. A defendant has the right to be represented by counsel at all critical stages of a criminal prosecution. [Citations.] At the same time, the United States Supreme Court has held that because the Sixth Amendment grants to the accused personally the right to present a defense, a defendant possesses the right to represent himself or herself." (*People v. Marshall* (1997) 15 Cal.4th 1, 20, citing *Faretta,*

*supra,* 422 U.S. at p. 819.)  The right of self-representation is not self-executing.  Rather, the defendant must make a knowing, voluntary and unequivocal assertion of the right of self-representation "within a reasonable time prior to the commencement of trial." (*Windham, supra,* 19 Cal.3d at p. 128; *People v. Marshall, supra,* 15 Cal.4th at pp. 20-21.)

In California, there is no bright-line test for determining the timeliness of a *Faretta* motion (*People v. Clark* (1992) 3 Cal.4th 41, 99); rather, the "reasonable time" requirement is to ensure that a defendant does not "misuse the *Faretta* mandate as a means to unjustifiably delay a scheduled trial or to obstruct the orderly administration of justice. . . . When the lateness of the request and even the necessity of a continuance can be reasonably justified the request should be granted.  When, on the other hand, a defendant merely seeks to delay the orderly processes of justice, a trial court is not required to grant a request for self-representation without any ability to test the request by a reasonable standard."  (*Windham, supra,* 19 Cal.3d at p. 128, fn. 5; *People v. Burton* (1989) 48 Cal.3d 843, 852-853 (*Burton* ).)

An untimely *Faretta* motion is addressed to the trial court's discretion.  In exercising its discretion, the court should consider certain criteria, including "the quality of counsel's representation . . . the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*Windham, supra,* 19 Cal.3d at p. 128; *People v. Jenkins* (2000) 22 Cal.4th 900, 959; *People v. Marshall* (1996) 13 Cal.4th 799, 827.)  The erroneous denial of a timely *Faretta* request is reversible per se.  (*People v. Butler* (2009) 47 Cal.4th 814, 824.)  An erroneous denial of an untimely *Faretta* motion, however, is reviewed under the harmless error test of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).  (*People v. Nicholson* (1994) 24 Cal.App.4th 584.)

In *People v. Lynch* (2010) 50 Cal.4th 693 (*Lynch*), overruled on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610, 636-643, the California Supreme Court held that a *Faretta* motion filed two weeks before trial was untimely.  (*Lynch, supra,* 50

9

Cal.4th at pp. 719, 726.) The court held: "[A] trial court may consider the totality of the circumstances in determining whether a defendant's pretrial motion for self-representation is timely. Thus, a trial court properly considers not only the time between the motion and the scheduled trial date, but also such factors as whether trial counsel is ready to proceed to trial, the number of witnesses and the reluctance or availability of crucial trial witnesses, the complexity of the case, any ongoing pretrial proceedings, and whether the defendant had earlier opportunities to assert his right of self-representation." (*Id.* at p. 726.) A trial court need not explicitly rely on the *Windham* factors, but may do so implicitly. (*People v. Marshall, supra,* 13 Cal.4th at p. 828.)

"[T]imeliness for purposes of *Faretta* is based not on a fixed and arbitrary point in time, but upon consideration of the totality of the circumstances that exist in the case at the time the self-representation motion is made." (*Lynch, supra,* 50 Cal.4th at p. 724.) "The fact that the granting of the motion will cause a continuance, and that this will prejudice the People, may be evidence of the defendant's dilatory intent. Similarly, the defendant's pretrial delays, in conjunction with a motion for continuance for the purpose of self-representation, would be strong evidence of a purpose to delay. [Citation.] In most of the cases finding a motion timely as a matter of law, no continuance would have been necessary." (*Burton, supra,* 48 Cal.3d at p. 854.) "Even when the trial court does not state it is denying a *Faretta* motion on the ground of untimeliness, we independently review the record to determine whether the motion would properly have been denied on this ground." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 433, fn. 15.)

3.    *Analysis*

Appellant's request for self-representation, which he made on the eve of trial was properly denied as untimely. (*Lynch, supra,* 50 Cal.4th at p. 722; *People v. Marshall, supra,* 13 Cal.4th at p. 827.) The California Supreme Court has held that, in the face of an untimely request, the grant of propria persona status may be conditioned on the defendant's ability to proceed with the trial without a continuance. (*People v. Jenkins, supra,* 22 Cal.4th at p. 1039.) The court has also "held on numerous occasions that

10

*Faretta* motions made on the eve of trial are untimely." (*Lynch, supra,* 50 Cal.4th at p. 722.)

Here, the trial court implicitly considered factors suggested in *Lynch,* noting the timing of the *Faretta* request on the heels of the denial of the *Marsden* motion, combined with the need for a continuance, and the resulting hardship to key witnesses. The court found that delaying trial would cause a significant disruption to the court and to justice. Further, there was a potential for an open-ended continuance, as it is unclear how much time appellant would have needed to prepare for trial. The need for such a delay, combined with the other factors considered by the trial court, justified its finding that the motion was untimely, as the trial court must be afforded " 'wide latitude in balancing the right to counsel of choice against the needs of fairness . . . and against the demands of its calendar.' " (*Lynch, supra,* 50 Cal.4th at p. 728.)

Thus, whether to grant the motion was not constitutionally mandated by the Sixth Amendment, but was a matter within the discretion of the trial court. (See *Lynch, supra,* 50 Cal.4th at pp. 721-722; *Windham, supra,* 19 Cal.3d at pp. 124, 127-128.) Nevertheless, appellant contends the trial court abused its discretion by failing to inquire whether the timing of the request was justified. He compares this case with a case in which the trial court had made no inquiry at all, but had summarily denied the defendant's motion. (See *People v. Herrera* (1980) 104 Cal.App.3d 167, 174.)

Here, however, the trial court did make an inquiry. The trial court was not required to state the reasons underlying its decision to deny a motion for self-representation; it was required only to establish a record sufficient to review its discretion. (*Windham, supra,* 19 Cal.3d at p. 129, fn. 6.) To establish such a record, the trial court should inquire into defendant's reasons for the request, the quality of counsel's representation, any prior proclivity of defendant to substitute counsel, the length and stage of the proceedings, and any disruption or delay which might reasonably be expected if the court granted the motion. (*Id.* at pp. 128-129.) After appellant made his request to represent himself, the trial court considered all these factors, other than the absence of a proclivity to bring such motions. Such absence does not indicate an abuse of discretion,

11

where, as in this case, the appellant had ample time beforehand to request self-representation, and had not shown good cause for the delay. (See *Burton, supra,* 48 Cal.3d at p. 854.)

We conclude that the trial court made a sufficient inquiry, and did not abuse its discretion in denying the motion. Although we find no error, we agree with the Attorney General that appellant has shown no prejudice from the denial of his motion. Appellant has merely argued that self-representation might have worked to his advantage, but does not suggest how it would have done so. His reasons for self-representation were that he could not work with appointed counsel and that counsel could not be prepared in time for trial.

As the trial court explained, defense counsel was doing an excellent job and there was no irreconcilable attorney-client conflict. Moreover, defense counsel represented that he was "certain" that he would be "adequately prepare[d]" for trial. We conclude there would not have been a result more favorable to appellant had he represented himself. "[A] defendant who represents himself virtually never improves his situation or achieves a better result than would trained counsel." (*People v. Rivers* (1993) 20 Cal.App.4th 1040, 1051-1052, citing *Faretta, supra,* 422 U.S. at p. 834.) The record shows that appellant was represented by competent counsel. During the *Marsden* hearing, defense counsel established that he had been diligent in representing appellant within the time limits imposed and had considered and responded to those requests made by appellant. The jury clearly found incredible appellant's version of the events. On this record, it is inconceivable that he, representing himself, would have achieved a more favorable result. Any interference with appellant's right of self-representation was not substantial and not prejudicial.

### B.    *No Abuse of Discretion Regarding the Alleged Late Discovery*

Appellant complains that the trial court erred in denying a midtrial motion for a mistrial based on alleged late discovery, and his alternative request for a late discovery instruction. The trial court did not abuse its discretion by denying the mistrial motion and refusing to give the requested instruction.

*1. Background*

a. Preliminary Hearing

At the preliminary hearing, Corporal Vasquez testified that when he arrived at the scene he made contact with appellant at the intersection of Pearce and Skelly. At some point, Corporal Vasquez saw another person walking in his direction. This individual was subsequently identified as Joseph. As Joseph approached Corporal Vasquez and appellant, who by now was in handcuffs, Joseph did not say anything in relation to appellant. Corporal Vasquez explained that he did not speak directly to Joseph. Rather, Sergeant Tafesse was the point person for Joseph at the scene. Sergeant Tafesse testified that Joseph did not initially say anything about appellant. When questioned about whether he asked Joseph "any specific questions" about appellant's involvement, Sergeant Tafesse replied: " I asked him to tell me briefly what happened. And at that point he told me that both him [*sic*] and his uncle were just robbed by suspects they didn't know."

b. Trial

In her opening statement, the prosecutor told the jury that once the police arrived at the scene, Joseph told them that he had called 911 because he thought his uncle was being robbed. The prosecutor asserted that when the police asked whether appellant " 'ha[d] something to do with it[,]' " Joseph replied, " 'Yes.' " The prosecutor said the police then secured appellant in the back of a patrol car while they went to check on things at the house. The prosecutor explained that later at the scene, Joseph and Romeo identified appellant in an in-field show-up.

In his opening statement, defense counsel told the jury that there would be no dispute that appellant had a role in the events in question, but the extent of his role was disputed. Counsel explained that the "central issue[s] in this case" were whether appellant was ever on the second floor of the victims' residence, "whether he was responsible for cooperating in tying up the folks in master bedroom, and whether he was the person responsible for issuing a threat" to Joseph. Counsel disputed the prosecutor's claim that Joseph positively identified appellant at the scene. Commenting on the

13

prosecutor's remarks, defense counsel told the jury, "Now, the district attorney just told you that she expects either Joseph or law enforcement officials to tell you that Joseph [said], 'That's one of the guys that was involved.' However, I expect you to hear evidence contrary to that." Counsel further explained that the evidence would show that Joseph was initially unable to identify appellant at the scene and that he only identified appellant after he was placed in a "fundamentally unreliable" show-up.

During trial, however, Corporal Vasquez and Sergeant Tafesse testified that, prior to the show-up, Joseph said that appellant was the man who had threatened him as he fled out his bedroom window. Defense counsel repeatedly objected to this evidence, complaining that he had not received any discovery from the prosecution indicating that, prior to the show-up, Joseph had identified appellant. Eventually, defense counsel moved for a mistrial, arguing that presentation of surprise evidence after his opening statement violated appellant's right to fair notice and due process. Defense counsel argued that his "entire case rested on [the] premise" that Joseph "had an honest but mistaken belief" that appellant was the person who threatened him.

The prosecutor explained that Sergeant Tafesse was called as a defense witness at the preliminary hearing and that, as such, defense counsel could have squarely addressed the identification issue. Instead, however, defense counsel "skirt[ed] around the issue." The prosecutor further explained that she "confronted Sergeant Tafesse dead on a couple of days ago when . . . preparing [for] this case and said, 'Look, Joseph . . . says during that scene with the four of you' [at the curb that appellant was the one who threatened to shoot him], which is on page 194 of the [preliminary hearing] transcript. [Sergeant Tafesse] said, 'Oh, yeah, I do kind of remember that, but, you know, everything was frantic. We didn't know what was going on in 190 Pearce.' . . . So he remembers it now when confronted with the facts." The prosecutor asserted that defense counsel could impeach the officers to the extent their testimony at trial differed from their preliminary hearing testimony.

In denying the motion for mistrial, the court explained: "It would be one thing where you're talking about a case where your own client hadn't told the police that he

14

had a role in this thing . . . I've read the materials. Under the aiding and abetting law if there was a summary judgment proceeding allowed in criminal cases, I'd grant summary judgment. What he says happened, as I understand it, is aiding and abetting." The court further noted that the veracity of Joseph's identification was "for the jury."

Following the denial of the motion for mistrial, defense counsel cross-examined Corporal Vasquez and Sergeant Tafesse about their police reports and their preliminary hearing testimony on the issue of whether Joseph volunteered any information about appellant prior to the in-field show-up. Sergeant Tafesse explained that often police officers do not recall everything right away and, as such, his police report reflected "just a portion of what [he] could recall at the time" he made his report.

At the close of trial, defense counsel requested that the jury be instructed with CALCRIM No. 306,[7] regarding the alleged late discovery issue. In denying the request, the court explained that the "instruction is for latent and intentional misrepresentation by one party to the other. . . . [¶] But the fact is that we can't be giving this instruction in every case where either side discovers something late and mentions it outside the courtroom door . . . unless it's just . . . essentially a blockbuster thing." The court further reasoned that CALCRIM No. 306 was reserved for instances of misconduct, and, as there was no such misconduct in this case; it would be unfair to the prosecution to give an instruction "that really suggests that the court is sanctioning somebody for . . . misconduct."

### 2. *Analysis*

A mistrial motion should be granted only when the moving party's chances of receiving a fair trial have been irreparably damaged. (*People v. Ayala* (2000) 23 Cal.4th

---

[7] CALCRIM No. 306 provides: "Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial. [¶] An attorney for the (People/defense) failed to disclose [describe evidence that was not disclosed] [within the legal time period]. [¶] In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure . . . ."

15

225, 283-284.) Whether a particular incident is incurably prejudicial is speculative, and the trial court is vested with considerable discretion in ruling on mistrial motions. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1154; *People v. Cox* (2003) 30 Cal.4th 916, 953, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Accordingly, a ruling on a mistrial motion is reviewed for an abuse of discretion (*People v. Ayala, supra,* 23 Cal.4th at p. 282), as is the determination regarding what, if any, remedy is required for a discovery violation. (*People v. Wimberly* (1992) 5 Cal.App.4th 773, 792.) Here, we find no abuse of discretion.

The challenged late discovery was occasioned by the limits of human recollection, a common occurrence at crime scenes where lives are at stake. The prosecutor explained how, just before trial, she confronted Sergeant Tafesse with the facts.[8] And, once Sergeant Tafesse was directly asked about what Joseph said vis-à-vis appellant's involvement, Sergeant Tafesse recalled Joseph's initial statements that appellant had threatened to shoot Joseph and/or harm the two women in the house. Prior to trial, defense counsel had ample opportunity to make the same examination if he wished. Nothing in the record suggests that the prosecutor delayed disclosure to obtain some advantage over the defense or that late discovery put the defense at any disadvantage in terms of the presentation of its case.

On this record, the court properly exercised its discretion by denying the request for mistrial and by declining to instruct the jury with CALCRIM No. 306 based on prejudice from the delayed disclosure of evidence.

## C. *No Abuse of Discretion in Excluding Evidence Regarding Victim's Grant of Immunity*

Next, appellant charges the trial court with error in excluding evidence that Romeo had been granted immunity at the preliminary hearing. As described in appellant's brief, his theory was that Romeo "was playing ball with the prosecution" and he "exerted influence" over Joseph with respect to the identification issue. According to appellant,

---

[8] The record reflects that a different district attorney represented the prosecution at the preliminary hearing.

16

the trial court should have allowed the jury to hear evidence regarding Romeo's immunity as this evidence was relevant in assessing Romeo's credibility. Appellant argues that in not being allowed to introduce this evidence, error occurred that deprived him of his constitutional rights to cross-examine and confront witnesses. We disagree.

### 1. Background

During the course of the preliminary hearing, the magistrate expressed concern about Romeo's "potential exposure" to a marijuana complaint. In response, the prosecutor offered Romeo "immunity for any marijuana found in his house" at the time of home invasion. Romeo, however, told the magistrate that he was willing to testify without a grant of immunity. Later, out of the presence of Romeo, defense counsel showed the magistrate photographs of the marijuana that the police observed at the house. Upon seeing the photographs, the magistrate said, "I think that [the prosecutor] is going to have to provide that immunity . . . [F]rom the photos I'm seeing here, you have a black garbage bag that appears to be three quarters full of marijuana." The prosecutor submitted a written immunity statement and based on this statement Romeo was granted use and derivative immunity.

Prior to trial, the court granted the prosecution's motion to exclude any mention of Romeo's grant of immunity at the preliminary hearing. In granting the in limine motion, the trial court noted: "The background that I read was that the court did it on its own motion, not on the People's motion, and I don't see where . . . it affected the testimony of the witness at all." The court further explained, "I don't want to get into having to explain what immunity means to a jury when it wasn't used."

At trial, Romeo testified on direct that the marijuana stored in the blue tub belonged to him. Romeo also admitted that marijuana found on the kitchen table belonged to him. On cross-examination, defense counsel did not question Romeo about the marijuana. Instead, defense counsel confronted Romeo about the discrepancies between his trial testimony and his preliminary hearing testimony regarding the sequence of events that occurred on the night in question, with emphasis on Romeo's discussions with Joseph.

17

*2. Analysis*

"The right of confrontation . . . 'means more than being allowed to confront the witness physically.' [Citation.] Indeed, ' "the main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination*' " [Citations.] . . . '[we] have recognized that the exposure of a witness'[s] motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.' . . . [T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination . . . '[t]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' [Citation.]" (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678-679.)

"Although we have said that '[c]ross-examination to test the credibility of a prosecuting witness in a criminal case should be given wide latitude' [citation], such latitude does not 'prevent the trial court from imposing reasonable limits on defense counsel's inquiry based on concerns about harassment, confusion of the issues, or relevance' [citations]. Moreover, reliance on Evidence Code section 352 to exclude evidence of marginal impeachment value that would entail the undue consumption of time generally does not contravene a defendant's constitutional rights to confrontation and cross-examination. [Citation.]" (*People v. Brown* (2003) 31 Cal.4th 518, 545.)

The court's ruling was a proper exercise of discretion under Evidence Code section 352. Preliminarily, Romeo did not testify *at trial* under a grant of immunity or inducement. Romeo, unlike the witnesses in the cases cited by appellant, testified freely as a *victim*. (See, e.g., *People v. Vines* (2011) 51 Cal.4th 830, 840-842, 844-846, 881-882 [accomplice's girlfriend testified under immunity]; *People v. Freeman* (1994) 8 Cal.4th 450, 488-490 [accessory testified under grant of immunity]; *People v. Sherow* (2011) 196 Cal.App.4th 1296, 1300, 1309-1310 [jewelry store manager testified under immunity where consent defense at issue]; *People v. Echevarria* (1992) 11 Cal.App.4th 444, 448-451 [accomplice testified under immunity]). Moreover, Romeo admitted at trial that the marijuana found at the scene belonged to him. Other evidence established that the

marijuana was found in multiple locations at Romeo's house and altogether it weighed about three-fourths of a pound. Based on this quantity, the jury could have reasonably inferred that Romeo possessed the marijuana for sale. Accordingly, the court could reasonably conclude that admission of Romeo's immunity status at the preliminary hearing was of marginal relevance at trial. On this record, the court did not abuse its discretion by refusing to allow a potentially confusing attempt "to impeach a witness whose untrustworthiness had already been portrayed to the jury." (*People v. Fisk* (1975) 50 Cal.App.3d 364, 370.)

### D. *No Abuse of Discretion in Granting Motion to Amend Information*

Appellant contends the trial court abused its discretion by allowing the information to be amended to add a second robbery offense after the prosecution had rested because the late amendment exposed him to increased criminal liability and also rendered ineffective the advice he received from counsel during plea negotiations.

#### 1. *Background*

The first amended information, filed on November 16, 2011, charged appellant with one count of first degree residential robbery (§§ 211, 212.5, subd. (a)), one count of first degree residential burglary (§§ 459, 460, subd. (a)), three counts of false imprisonment (§§ 236, 237, subd. (a)), and one count of criminal threats (§ 422). The information named four victims of the robbery count, to wit: Romero (herein Romeo), Joseph, Cunha, and Rodrigues. On November 30, 2011, after the prosecution had rested, the prosecutor moved to amend the information to charge an additional robbery count consistent with the evidence at the preliminary hearing. Specifically, the prosecutor sought to amend the information to reflect that Romeo and Cunha were "two separate robbery victims in two separate counts." Defense counsel objected that the untimely amendment failed to provide appellant with adequate notice and it would expose him to liability for two strikes rather than just one.

The court noted that allowing the amendment could cause prejudice to appellant "in the sense of turning down plea offers." The court explained that regardless of what appellant was offered, "he had to evaluate it against his downside." The court further

19

stated that if it did not allow the amendment, there would be "a serious legal question as to whether [it] could impose anything other than a single sentence on [the single robbery] count."

The prosecutor responded that it was necessary to amend the information to conform with the evidence at trial. The prosecutor further argued that the amendment was a "legal necessity" to cure "a technical deficiency" in the information. She explained that "the way it's alleged now . . . there's four people in Count 1. If the jury were to deliberate on Count 1 and return a vote of guilty, who was robbed?" The prosecutor apologized for not detecting the pleading deficiency sooner and explained that her intent was not to increase the punishment, explaining, "If my goal were to try to increase the defendant's exposure of penalty in this case, I would be moving . . . to amend to add a kidnapping, a life count, that I think has been shown, but that is not my purpose."

Defense counsel offered to forego any unanimity instruction as an alternative to the requested amendment. He reiterated his notice-based due process claim and further elaborated that he did not "have a fair opportunity to advise [his] client about [increased liability], and adding another strike and with a 3/6/9 triad is not a trivial matter."

The trial court expressed its concern that the pleading deficiency should have been discovered earlier. The court criticized the prosecutor and defense counsel for failing to realize that the information was "a compound pleading. It's really four counts, just labeled Count 1." The court added, "you both should have known as members of the criminal bar that it should have never been pled the way it was pled." Ultimately, the trial court granted the request, explaining that it was "really to just correct [the] form and not [the] substance. The substance is already there." The information was amended to add a second robbery count; count one referred to the robbery of Romeo, and count two referred to the robbery of Cunha.[9]

---

[9]     By this amendment, Joseph and Rodrigues were no longer listed as robbery victims.

## 2. *Notice*

Constitutional due process requires that an accused be advised of the charges against him so as to permit a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at trial. (U.S. Const., 6th Amend.; *People v. Torres* (2011) 198 Cal.App.4th 1131, 1140.) That said, a trial court may permit amendment of an information at any time during the proceedings, even after the evidence has closed, provided the amendment is supported by evidence at the preliminary hearing, and does not prejudice the defendant's substantial rights. (§ 1009;[10] *People v. Arevalo–Iraheta* (2011) 193 Cal.App.4th 1574, 1581.) A trial court's decision to permit the amendment of an information will not be reversed absent a showing of a clear abuse of discretion. (*People v. Arevalo–Iraheta, supra,* at p. 1581.)

Here, the trial court granted the amendment because it did not believe the defense was prejudiced by the amendment, as it merely changed the form of the pleading not the substance. We find no abuse of discretion. Contrary to appellant's assertion, an amendment that exposes a defendant to increased criminal liability does not offend due process. He does not cite any case or other authority, and does not persuade us, that an amendment increasing criminal liability should be denied. Rather, the relevant inquiry is whether the amendment is supported by evidence at the preliminary hearing. (§ 1009; *People v. Arevalo–Iraheta, supra,* 193 Cal.App.4th at p. 1581.) As our Supreme Court explained in *Jones v. Superior Court* (1971) 4 Cal.3d 660, 664–665: "[T]he rule has developed that an information which charges the commission of an offense not named in the commitment order will not be upheld unless (1) the evidence before the magistrate shows that such offense was committed ([]§ 739), and (2) that the offense 'arose out of the transaction which was the basis for the commitment' on a related offense. [Citation.]"

---

[10] Section 1009 provides in part, "An indictment or accusation cannot be amended so as to change the offense charged, nor an information so as to charge an offense not shown by the evidence taken a the preliminary examination."

Here, evidence at the preliminary hearing established two separate robberies. Specifically, Romeo testified that the intruders took his rent money ($4,500 in cash), an iPad, a computer he shared with Cunha, one of his bracelets, all of Cunha's jewelry, as well as Cunha's purse. This evidence is sufficient to support a finding that two robberies occurred. Accordingly, the trial court did not abuse its discretion under section 1009 by granting the prosecutor leave to amend the information to add a second count of robbery. (*People v. Arevalo-Iraheta*, *supra*, 193 Cal.App.4th at p. 1581.)

Appellant's reliance on *People v. Hembree* (1956) 143 Cal.App.2d 733, to show error is misplaced. In *Hembree,* the original charge was abandoned and two new charges were added after the defense had begun its case. (*People v. Hembree, supra,* 143 Cal.App.2d at pp. 733-734.) There, the court found that defendant had been denied a fair trial. (*Id.* at p. 744.) That is not the case here, where the defense to the new robbery charge was virtually identical to the defense to the original robbery charge.

### 3. Assistance of Counsel

Finally, appellant suggests that his Sixth Amendment right to counsel was abridged by the late amendment, due to alleged ineffectiveness of counsel during the plea negotiation process. The Attorney General argues that this argument has been forfeited because it was not presented to the trial court. In response, appellant argues this issue was preserved for appeal by defense counsel's objection that he had not advised appellant during plea negotiations about the consequences of an amended information.

Assuming without deciding that this claim has been preserved for appeal, it, nevertheless, fails on the merits. A criminal defendant has a federal and state constitutional right to the effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 685-686 (*Strickland*); *People v. Maury* (2003) 30 Cal.4th 342, 389, cert. den. *sub nom. Maury v. California* (2004) 540 U.S. 1117; see U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 15.) The right to effective assistance of counsel includes the right to be informed of the consequences of refusing a proffered plea bargain. (*In re Alvernaz* (1992) 2 Cal.4th 924, 933–934, 936 (*Alvernaz*); *Missouri v.*

*Frye* (2012) 132 S.Ct. 1399, 1408 [182 L.Ed.2d 379] ["defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused" and failure to do so constitutes ineffective assistance]; *Lafler v. Cooper* (2012) 132 S.Ct. 1376, 1384 [182 L.Ed.2d 398] [counsel renders ineffective assistance when bad advice "results in a rejection of the plea offer and the defendant is convicted at the ensuing trial"].)

To establish a claim of incompetence of counsel, a defendant must demonstrate both that counsel's representation fell below an objective standard of reasonableness and that it is reasonably probable that, but for counsel's error, the result of the proceeding would have been different. (*Strickland, supra,* 466 U.S. at pp. 686–688, 694–695; *People v. Maury, supra,* 30 Cal.4th at p. 389; see *People v. Benavides* (2005) 35 Cal.4th 69, 92–93; *Alvernaz, supra*, 2 Cal.4th at pp. 936–937.) It is the defendant's burden on appeal to establish both deficiency and prejudice. (*People v. Williams* (1988) 44 Cal.3d 883, 937.) In demonstrating prejudice, the defendant "must carry his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel. [Citation.]" (*Ibid.*) Where, as here, a claim of ineffective assistance of counsel is raised on direct appeal, the facts supporting both deficiency and *prejudice must appear in the appellate record*. (*People v. Gray* (2005) 37 Cal.4th 168, 207.)

"[N]ormally a claim of ineffective assistance of counsel is appropriately raised in a petition for writ of habeas corpus (see, e.g., *People v. Mendoza Tello* [(1997)] 15 Cal.4th 264[, 266–267]), where relevant facts and circumstances not reflected in the record on appeal, such as counsel's reasons for pursuing or not pursuing a particular trial strategy, can be brought to light to inform the two-pronged inquiry of whether counsel's 'representation fell below an objective standard of reasonableness,' and whether 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' [Citation.]" (*People v. Snow* (2003) 30 Cal.4th 43, 111.) Reviewing courts are not to become engaged " 'in the perilous process of second-guessing.' [Citation.]" (*People v. Pope* (1979) 23 Cal.3d 412, 426, overruled on

other grounds in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

Here, appellant fails to establish any deficiency in counsel's performance and resulting prejudice. Rather, his argument is based on pure speculation that had the second robbery count been alleged in the information, he would have accepted a plea bargain "rather than proceeding to trial had trial counsel advised him of the possibility of amendment and the consequence." Even assuming for the sake of argument that defense counsel's assessment of appellant's potential criminal liability was incorrect, the appellate record discloses no basis for concluding that " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' [Citation.]" (*People v. Snow, supra,* 30 Cal.4th at p. 111.) In order to prevail on a claim of ineffective assistance of counsel based upon counsel's failure to adequately convey a settlement offer to a defendant, "[i]n addition to proving that he or she would have accepted the plea bargain, a defendant also must establish the probability that it would have been approved by the trial court. Such a requirement is *indispensable* to a showing of prejudice . . . ." (*Alvernaz, supra,* 2 Cal.4th at pp. 940–941, italics added.)

Here, the record is silent regarding whether a plea would have been offered by the district attorney, and, more importantly whether it would have been approved by the trial court. "In exercising their discretion to approve or reject proposed plea bargains, trial courts are charged with the protection and promotion of the public's interest in vigorous prosecution of the accused, imposition of appropriate punishment, and protection of victims of crimes. [Citation.] For that reason, a trial court's approval of a proposed plea bargain must represent an informed decision in furtherance of the interests of society [citation]; as recognized by both the Legislature and the judiciary, the trial court may not arbitrarily abdicate that responsibility. . . . [¶] Thus, although it may well be that in our frequently overcrowded courts, judicial rejection of plea bargains is the exception rather than the general rule, we may not simply presume . . . that the trial court automatically would have approved a plea bargain negotiated by the prosecutor and the defense." (*Alvernaz, supra,* 2 Cal.4th at p. 941, italics & fn. omitted.) Accordingly, we cannot, on

this record, presume to know what the district attorney would have offered and whether the trial court would have approved the offer.  (*Id.* at pp. 940–941.)

For these reasons, we conclude appellant's ineffective assistance claims fail on direct appeal and they are properly considered in a habeas corpus proceeding.  (*People v. Diaz* (1992) 3 Cal.4th 495, 566; *People v. Cummings* (1993) 4 Cal.4th 1233, 1342.)

## III. DISPOSITION

The judgment is affirmed.


_____
REARDON, J.


We concur:


_____
RUVOLO, P. J.


_____
RIVERA, J.