Filed 8/4/16  P. v. McClelland CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DAVION McCLELLAND,<br><br>    Defendant and Appellant. | 2d Crim. No. B260644<br>(Super. Ct. No. BA385552)<br>(Los Angeles County) |

A jury convicted Davion McClelland of two counts of first-degree murder and two counts of attempted premeditated murder (Pen. Code, §§ 187, subd. (a), 189, 664)[1] and found true a multiple-murder special circumstance (§ 190.2, subd. (a)(3)) and allegations that he personally used a firearm (§ 12022.53, subds. (b)-(e)) and committed the offenses for a criminal street gang (§ 186.22, subd. (b)(4)).  He was sentenced on the murder counts to two consecutive terms of life without the possibility of parole plus two 25-year-to-life enhancements for the gun use allegations, and on the attempted murder counts to two concurrent terms of life plus two 25-year-to-life enhancements for the gun use allegations.

---

[1] All further statutory references are to the Penal Code.

McClelland contends that the trial court erred by denying his motion to suppress statements about his gang affiliation obtained in violation of his Fourth and Fifth Amendment rights, excluding evidence of third-party culpability in violation of the Sixth Amendment's confrontation clause and his due process right to present a defense, and failing to instruct the jury that unanimous agreement on the degree of the murders was required. In addition, he requests that we independently review the trial court's in-camera hearing on his *Pitchess* motion[2] and correct an error regarding his presentence custody credit. We correct his custody credit and otherwise affirm.

## FACTS

McClelland and an unidentified male were riding bicycles up and down Hooper Avenue near 55th Street in Los Angeles one evening. This area was claimed by the Blood Stone Villains (BSV) gang as its territory. McClelland was a member of the rival Pueblo Bishop Bloods (Pueblos) gang.

McClelland and his companion encountered Michael Smith and BSV member Kenneth Corbin walking along Hooper. Either McClelland or his companion called out "Sawoop," indicating that he was a member of a gang affiliated with the Bloods. Smith and Corbin turned around and gave them a "head nod." McClelland started shooting at them, firing about six shots in total. Although neither Corbin nor Smith was struck, one bullet entered a nearby backyard, striking and killing both 22-month-old Joshua Montes and his great uncle who was carrying him.

## DISCUSSION

### *Suppression of Gang Affiliation Evidence*

McClelland contends that the trial court violated his Fourth and Fifth Amendment rights by not suppressing statements he made to the police regarding his gang affiliation.

The Fourth Amendment protects "against unreasonable searches and seizures" by the police. (U.S. Const., 4th Amend.) Evidence obtained in violation of

---

[2] (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531.)

this guarantee may not be used in a subsequent prosecution. (*Mapp v. Ohio* (1961) 367 U.S. 643, 655.) On review of a ruling denying a motion to suppress such evidence, we view the facts most favorably to the prosecution and uphold the trial court's factual findings if supported by substantial evidence. (*People v. Woods* (1999) 21 Cal.4th 668, 673.) We decide independently whether a search or seizure was reasonable under the Fourth Amendment. (*People v. Weaver* (2001) 26 Cal.4th 876, 924.)

The Fifth Amendment guarantees that a criminal defendant may not "be compelled . . . to be a witness against himself." (U.S. Const., 5th Amend.) This precludes the prosecution from using "statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." (*Miranda v. Arizona* (1966) 384 U.S. 436, 444.) Such procedural safeguards include, prior to any questioning, a warning "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." (*Ibid.*) We "defer to the trial court's resolution of disputed facts, including the credibility of witnesses, if that resolution is supported by substantial evidence," and independently determine whether the challenged statement was obtained in violation of *Miranda*. (*People v. Weaver*, *supra*, 26 Cal.4th at p. 918; *People v. Davis* (2009) 46 Cal.4th 539, 586.)

Five weeks before the shootings, Officers Nathan Brown and Samuel Briggs were on patrol in the Pueblo Del Rio housing project around 12:50 a.m. Brown was familiar with the area. It had a high rate of gang and narcotics activity, especially by non-residents violating a posted "no trespassing" sign. During the previous two years he "[m]ade a number of arrests there and documented a number of [Pueblos members]" while working in the criminal gang unit. It was "inherently a dangerous place [for] police officers" because gangs that conducted business there had a tactical advantage and would ambush officers. The police normally entered the housing project with more than two officers.

3

Brown and Briggs saw McClelland walking between two buildings. McClelland was wearing a dark hoodie pulled over his head. He was "walking back and forth" "without any apparent purpose or direction" and "looking left and right in a manner consistent with monitoring police response." He appeared to be "loitering for the purpose of selling narcotics" and "looked to be under 18 years of age in violation of curfew."

The officers followed him. They separated and circled around two buildings so that they could track him on both sides. McClelland turned a corner and "nearly walked into [Brown]." McClelland was looking back towards Briggs and appeared to be attempting to evade him. Brown observed a heavy item the size of a handgun in the center pocket of McClelland's hoodie, causing it to sag. Brown immediately suspected it was a handgun.

Brown told McClelland, "Come over here and put your hands behind your head and face the wall quick." With one hand, Brown held McClelland's hands behind his head and with the other did a patdown weapons search. Brown felt an L-shaped object and removed a handgun from the hoodie.

Briggs gave McClelland *Miranda* warnings because Brown "had gang questions that [he] was interested in asking." Brown could not recall whether the warnings were given in the field or at the police station. McClelland was asked if he understood the warnings and said "yes." He then answered gang-related questions, including his gang affiliation, his gang name, and his friends in the gang.

The trial court ruled that "given the totality of the circumstances, the fact that this was [an] area where there were no trespassing signs and the time of night and the conduct described in detail by the officers and the fact that he tried to avoid them[,] . . . I think it follows that if he was going to pat him down he had to be in the process of detaining him. [¶] So I do find that he had reasonable suspicion to detain him briefly to check out his right to be in the area and what he was doing and so forth. [¶] And the way he described the [patdown] seems to me that a gun would be fairly discernable and that's what he did describe so I think he had probable cause to make

4

the arrest and gave him *Miranda* and the defendant made the statements so I will allow the statements."

McClelland claims that the police stopped him without reasonable suspicion of a crime. To the contrary, this is a classic "stop and frisk" in which "a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where . . . he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." (*Terry v. Ohio* (1968) 392 U.S. 1, 30.)

Officer Brown had reasonable suspicion that McClelland was a minor violating curfew. (See Los Angeles Mun. Code, § 45.03; *In re Justin B.* (1999) 69 Cal.App.4th 879, 889 ["As a general rule, a peace officer is entitled to take a minor who is in violation of a local curfew ordinance into 'temporary custody,' the functional equivalent of the arrest of an adult"].) McClelland was alone, walking about aimlessly after midnight. He appeared to be a minor.[3] Furthermore, the area's high degree of drug activity, the late time of night, McClelland's constant glances around, and his attempt to evade the police gave the officers reasonable suspicion that he was loitering to sell drugs.

McClelland argues that these factors, taken individually, are insufficient to establish reasonable suspicion of criminal activity justifying a brief detention. This misses the point. "'In evaluating the validity of a stop such as this, we must consider "the totality of the circumstances—the whole picture."'" [Citation.]" (*People v. Souza* (1994) 9 Cal.4th 224, 239; see also *id.* at p. 240 [based on "the area's reputation for criminal activity, the presence of two people near a parked car very late at night and in total darkness, and evasive conduct" the officer "reasonably suspected that

_____

[3] Smith later testified that McClelland and his accomplice looked young, "[l]ike school kids."

5

criminal activity was afoot"].)  In light of the appearance that McClelland was concealing a handgun in his hoodie, Brown could lawfully perform a patdown search for weapons before investigating further.  (*People v. Miles* (1987) 196 Cal.App.3d 612, 618.)

McClelland also claims that the police advised him of his *Miranda* rights in an intentionally misleading way, rendering his implied waiver of the rights ineffectual.  "In general, if a custodial suspect, having heard and understood a full explanation of his or her *Miranda* rights, then makes an uncompelled and uncoerced decision to talk, he or she has thereby knowingly, voluntarily, and intelligently waived them.  [Citation.]  Law enforcement officers are not required to obtain an express waiver of a suspect's *Miranda* rights prior to a custodial interview.  [Citation.]" (*People v. Cunningham* (2015) 61 Cal.4th 609, 642.)

Here, McClelland was informed of his rights, he acknowledged that he understood them, and the police were not "yelling at him or threatening him or anything like that" when they questioned him.  In the case upon which he relies, *People v. Hawthorne* (2009) 46 Cal.4th 67, abrogated on other grounds by *People v. McKinnon* (2011) 52 Cal.4th 610, the Supreme Court concluded that under similar circumstances the defendant impliedly waived his *Miranda* rights by continuing to answer questions.  (See *Hawthorne*, at pp. 87-88.)

McClelland asserts in his reply brief that the prosecution failed to prove the implied *Miranda* waiver occurred before the gang-related questions.  He forfeited this argument by failing to raise it in his opening brief.  (*People v. Tully* (2012) 54 Cal.4th 952, 1075.)  It is also meritless.  Brown testified that when McClelland "answer[ed] questions about . . . his gang involvement," it was "after" being "Mirandized."  The trial court properly refused to suppress his statements concerning his gang affiliation.

*Third-Party Culpability Evidence*

McClelland contends that the trial court denied his rights to confront witnesses and present a defense by excluding evidence of third-party culpability.  "To

6

be admissible, the third party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability." (*People v. Hall* (1986) 41 Cal.3d 826, 833.) Rather, "courts should simply treat [such] evidence like any other evidence: if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([*id.*,] § 352)." (*Id.* at p. 834.) We review the trial court's exclusion of third-party culpability evidence for abuse of discretion. (*People v. Elliott* (2012) 53 Cal.4th 535, 581.)

Renee Lewis, McClelland's aunt, testified that she resided in the Pueblo Del Rio housing project and that McClelland occasionally stayed with her. He left clothes—including a hoodie and apparel signifying an affiliation with the Pueblos gang—in her apartment. She saw him a few days before the murders riding a bicycle similar to the one used by the perpetrator. She also saw another nephew, Jaquain Smith (Jaquain),[4] riding the same bicycle around that time. Jaquain was "a little thicker" or "heavier" than McClelland, who was "kind of skinny."

Defense counsel sought to present testimony from Lewis that three hours after the murders, Jaquain showed up at her apartment "banging on the door" in "a state of agitation." Jaquain was sweaty and pacing. He asked if he and an unidentified person accompanying him could stay the night. Defense counsel asserted that this evidence was relevant "to argue . . . inferentially that [McClelland] was not the shooter" and that "[Jaquain's] behavior arguably shows that he thinks he's guilty" as the shooter. The trial court ruled that the proposed evidence was inadmissible because "it doesn't help [the jury] resolve who is the shooter" and "[t]he jury still knows [that]

---

[4] We refer to Jaquain Smith by his first name in order to avoid confusion with victim Michael Smith. No disrespect is intended.

there are two people involved" and that there is "some evidence the defendant is the shooter."

The trial court was correct. It is undisputed that there were two men on bicycles involved in the murders—the shooter and his accomplice. That Jaquain may have been one of them did not call into question McClelland's involvement. (Cf. *People v. Hall*, *supra*, 41 Cal.3d at p. 835 ["Because no testimony or circumstantial evidence limited the number of perpetrators, [the third party's] participation would not undermine the significant evidence linking defendant to the murder"].) Defense counsel agreed with the trial court that he was not offering "evidence . . . that [Jaquain] did it and not the defendant." When the trial court asked "what evidence" there was that Jaquain was the shooter rather than the accomplice, defense counsel stated, "Just this consciousness of guilt activity that would be described by [Lewis]." Even if Jaquain's "suspicious" behavior was probative of his involvement in the murders, it was not probative of his role as either the shooter or as an accomplice.

McClelland asserts here that he "was skinny," Jaquain "was heavier than [him]," and victim Michael Smith "testified that the shooter was chubbier than the other bicyclist."[5] Smith's testimony was not introduced until after the trial court made its evidentiary ruling, however, and McClelland failed to raise the issue. Regardless, Smith's testimony has no bearing on the analysis. While it was probative as to McClelland's involvement in the murders and role as the shooter, Lewis's proposed testimony was not and risked confusing the jury.

McClelland also asserts that Lewis's testimony would have revealed "[Jaquain's] request to . . . allow another unidentified person to stay over[night]."

---

[5] Two weeks after the shooting, the police showed Smith a "six pack" photographic lineup from which he identified McClelland as the shooter. At trial, Smith again identified McClelland as the shooter. Defense counsel asked Smith about his testimony at the preliminary hearing that McClelland "was there" at the shooting but "that the shooter was thicker than Mr. McClelland" and Smith "[didn't] know if [McClelland] was the shooter." Smith explained that he was not "a hundred percent . . . sure" that McClelland was the shooter.

Even assuming that [Jaquain] had some involvement in the shootings, the fact that he was seen three hours later with an unknown person is irrelevant. To the extent this "unidentified" person was not McClelland, as he speculates, there is no evidence that the person had any connection to the murders.

Lastly, McClelland challenges the trial court's refusal to let defense counsel question Officer Leonardo McKenzie about Jaquain's alleged statement during a custodial interrogation that he was present at the scene of the crime and was riding a bike. The trial court properly excluded it as hearsay. (See *People v. Hall*, *supra*, 41 Cal.3d 826 at pp. 834-835 ["As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense. . . . [T]his principle applies perforce to evidence of third-party culpability"].) Moreover, it was improper third-party culpability evidence because it did not raise a reasonable doubt about McClelland's involvement. At most, it showed Jaquain had an opportunity to commit the crimes with him. (See *People v. Abilez* (2007) 41 Cal.4th 472, 517 ["A criminal defendant may introduce evidence of third party culpability if such evidence raises a reasonable doubt as to his guilt, but the evidence must consist of direct or circumstantial evidence that links the third person to the crime. It is not enough that another person has the motive or opportunity to commit it"].)

*Jury Instructions*

McClelland contends that the trial court failed to instruct the jury that it must unanimously agree on the degree of murder, denying him his constitutional rights to due process, a fair trial, and to present a defense. Jury unanimity is guaranteed by the due process clauses of the federal and state Constitutions. (*People v. Arevalo–Iraheta* (2011) 193 Cal.App.4th 1574, 1588.) "A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant. [Citations.]" (*People v. Cross* (2008) 45 Cal.4th 58, 67-68.) In evaluating the likelihood of a misunderstanding, we consider the jury instructions as a whole, the arguments of counsel, and the entire record. (*People v. Mills* (2012) 55 Cal.4th 663,

680.)  We assume jurors will exercise intelligence and common sense.  (*People v. Coddington* (2000) 23 Cal.4th 529, 594, overruled on other grounds by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)  We review the propriety of jury instructions de novo.  (*People v. Leeds* (2015) 240 Cal.App.4th 822, 830.)

The trial court instructed the jury as follows:  "If you decide that the defendant committed murder it is murder of the second degree unless the People have proved beyond a reasonable doubt that it is murder of the first degree . . . ."  (CALCRIM No. 520.)  "The defendant has been prosecuted for first-degree murder under two theories:  One, the murder was willful, deliberate and premeditated and, two the murder was committed by lying in wait.  [¶]  Each theory of first-degree murder has different requirements and I will instruct you on both.  [¶]  You may not find the defendant guilty of first-degree murder unless all of you agree that the People have proved that the defendant committed murder but all of you do not need to agree on the same theory."  (CALCRIM No. 521.)

The trial court slightly modified the concluding language of the instruction:  "The People have the burden of proving beyond a reasonable doubt that the killing was first-degree murder rather than a lesser crime.  [¶]  If the People *have proven the defendant has committed murder but* have not met the burden *of proving it was first-degree murder* you must find the defendant not guilty of first-degree murder and the murder is second-degree murder."  (CALCRIM No. 521, trial court's modifications in italics.)

McClelland argues that "[w]hen the jurors in this case were told they need not 'all [. . .] agree on the same theory,' the jurors were misled into thinking they did not have to all agree on whether [he] was guilty of first or second degree murder upon unanimously reaching a murder verdict."  We conclude otherwise.

It is clear from the trial court's instructions on CALCRIM Nos. 520 and 521 that the jury's first-degree murder finding must be unanimous but the theory underlying it need not be.  To the extent there was any ambiguity, the trial court expressly instructed jurors with CALCRIM No. 640 that they must unanimously agree

10

on whether the murder was in the first or second degree.[6] The court reiterated the necessity for unanimity with CALCRIM No. 3550, instructing that "[y]our verdict on each count and any special finding must be unanimous. This means that, to return a verdict, all of you must agree to it."

Moreover, the prosecutor clarified the issue during closing argument: "[W]hat the law tells us for first-degree murder is if, for instance, six of you believe that the crimes here for which the defendant is guilty or responsible was done with willful, premeditation and deliberation and six of you disagree but believe that the crimes were done through lying in wait for the murders charged in this case the twelve of you have just reached a unanimous verdict on first-degree murder. [¶] Let me

---

[6] The trial court instructed in relevant part as follows: "You will be given verdict forms for guilty and not guilty of first-degree murder and second-degree murder. [¶] You may consider these different kinds of homicide in whatever order you wish but I can accept a verdict of guilty or not guilty of second-degree murder only if all of you have found the defendant not guilty of first-degree murder. [¶] As with all the charges in this case to return a verdict of guilty or not guilty of a count you must all agree to that decision. [¶] . . .[¶]

"One, if all of you agree that the people have proved beyond a reasonable doubt that the defendant is guilty of first-degree murder complete and sign that verdict form. Do not complete or sign any other verdict forms for that count.

"Two, if all of you cannot agree whether the defendant is guilty of first-degree murder inform me that you cannot reach an agreement and do not complete or sign any verdict form for that count.

"Three, if all of you agree that the defendant is not guilty of first-degree murder but also agree the defendant is guilty of second-degree murder complete and sign the form for not guilty of first-degree murder and the form for guilty of second-degree murder. Do not complete or sign any other verdict form for that count.

"Four, if all of you agree that the defendant is not guilty of first-degree murder but cannot agree whether the defendant is guilty of second-degree murder complete and sign the verdict form for not guilty of first-degree murder and inform me that you cannot reach further agreement. Do not complete or sign any other verdict form for that count.

"Five, if you all agree the defendant is not guilty of first-degree murder and not guilty of second-degree murder complete and sign the forms for not guilty of first-degree murder and not guilty of second-degree murder. Do not complete or sign any other verdict forms for that count."

11

repeat that. [¶] What I'm trying to say [is] you don't have to be unanimous as to which of these two theories it is as long as each of you is convinced beyond a reasonable doubt that one or more of these two theories apply."

*People v. Sanchez* (2013) 221 Cal.App.4th 1012, upon which McClelland relies, is distinguishable. In that case, there were two theories of murder but only one was applicable to each degree. Thus, jurors could not differ on the theory of murder and still reach a unanimous verdict notwithstanding "[t]he final instruction . . . on unanimity . . . that [they] need not agree on the theory of guilt." (*Id.* at p. 1025.) Here, in contrast, there were multiple theories of first-degree murder, which helped put the instruction at issue in context. Unlike in *Sanchez,* the last instruction that the jury here received on the matter—CALCRIM No. 640—was that unanimity was required as to the degree of murder. The jury instructions were not misleading.

As McClelland points out, the trial court made one minor misstatement. Pursuant to CALCRIM No. 359, the trial court instructed, "You may rely upon the defendant's out-of-court statements to convict him only if you first conclude that the other evidence shows that the charged crime or lesser-included offense was committed." It then added, erroneously, "Here there is no lesser-included offense so disregard that part of the statement." While it was once true that first- and second-degree murder constituted a single offense, that is no longer the rule. (*Gomez v. Superior Court in and for Mendocino County* (1958) 50 Cal.2d 640, 643-644.) Because this was the only discussion of a "lesser-included offense" and the jury was properly instructed on second-degree murder, the trial court's misstatement was harmless.

*Pitchess Motion*

Prior to trial, McClelland filed a *Pitchess* motion for discovery of information in Officers Brown's and Briggs's personnel files regarding complaints and allegations regarding false statements and other dishonest conduct. The trial court

12

granted the motion and held an in-camera hearing, in which it found some discoverable items that were turned over to defense counsel.

McClelland asks us to independently review the sealed transcripts of the in-camera proceedings on his *Pitchess* motion. We have done so and conclude there was no error. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1232.)

*Custody Credit*

The trial court awarded McClelland 1,280 days of presentence custody credit. He contends, and the People concede, that he is entitled to 1,288 days of credit. We agree. We will modify the judgment accordingly and order an amended abstract of judgment.

DISPOSITION

The judgment is modified to reflect 1,288 days of presentence custody credit. Upon remittitur issuance, the clerk of the superior court is directed to prepare an amended abstract of judgment reflecting this modification and to send a certified copy of that abstract to the California Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.


PERREN, J.


We concur:


GILBERT, P. J.


YEGAN, J.


13

Curtis B. Rappe, Judge

Superior Court County of Los Angeles

_____

Thomas T. Ono, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and Stacy S. Schwartz, Deputy Attorney General, for Plaintiff and Respondent.